**CLEVELAND REGIONAL MEDICAL CENTER, L.P., Community Health Systems, Inc., and CHS/Community Health Systems, Inc., Appellants,**

v.

**CELTIC PROPERTIES, L.C., Appellee.**

No. 09–08–00263–CV.

Court of Appeals of Texas, Beaumont.

Submitted May 7, 2009.

Decided Sept. 30, 2010.

Daniel V. Flatten, Nicholas A. Simms, Kerry McMahon, Porter & Hedges, L.L.P., Houston, for appellants.

Karen D. Smith, Joseph T. Kennedy, Kirby D. Hopkins, Drucker, Rutledge & Smith, L.L.P., The Woodlands, for appellee.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

CHARLES KREGER, Justice.

Celtic Properties, L.C. ("Celtic") filed a lawsuit against Cleveland Regional Medical Center, L.P. ("CRMC") for breach of a lease agreement, failure to pay rent, and breach of CRMC's common law duty to maintain the building it leased in a suitable condition. Celtic amended its suit adding Community Health Systems, Inc. ("CHS") and CHS/Community Health Systems, Inc. ("CHS/CHS") as defendants, alleging additional causes of action. After trial on the merits, the jury returned a verdict in favor of Celtic. Following the jury's verdict, CRMC filed a motion for new trial and a motion for judgment notwithstanding the verdict. The trial court entered final judgment in favor of Celtic on March 11, 2009. CRMC, CHS and CHS/CHS (collectively referred to as "appellants") filed this appeal raising thirteen separate issues. We affirm in part and reverse in part.

## FACTUAL BACKGROUND

In 1994, CRMC suggested that Dr. Rick Kelley and Dr. John Murphy jointly move their medical practices to a facility in Cleveland, Texas to encourage the production of more patient services in their respective fields of practice. Drs. Kelley and Murphy agreed and formed Celtic Properties, L.P., to purchase 301 Sleepy Hollow in Cleveland, Texas, the property at the center of this dispute ("Property"). The Property contained two office suites, 301A and 301B, which were to be divided between Drs. Kelley and Murphy. Both spaces needed renovation. CRMC financed the build-out, which was completed in late 1995.

On July 15, 1994, Celtic and CRMC executed a written lease agreement whereby CRMC agreed to lease the Property for five years. After CRMC leased the Property from Celtic, CRMC subleased the Property back to Drs. Kelley and Murphy. The subleases allowed the doctors to amortize the cost of the build-out through their monthly lease payments and allowed CRMC to manage and oversee health care in the community without becoming a property owner. In July 1996, Celtic and CRMC executed a first amendment to the lease. The first amendment modified the rent and extended the lease through June 30, 2003. The original lease agreement of July 15, 1994 and the first amendment to the lease executed in July 1996 together were considered the Master Lease.

At some point thereafter Dr. Kelley began experiencing financial difficulties. Eventually, Dr. Murphy purchased Dr. Kelleys interest in Celtic, expecting Dr. Kelley to vacate suite 301A shortly thereafter. The subleases were amended a second time to reflect Dr. Kelleys sale of his interest in Celtic to Dr. Murphy. Contrary to Dr. Murphys expectations, Dr. Kelley continued practicing in suite 301A.

### The Letter Agreement

In 1999, the terms of the Master Lease were renegotiated when Dr. Murphy agreed to act as the medical director of the Cleveland Hospital Rural Health Center in Livingston for CRMC. In February 1999, the parties executed a letter of intent, which expressly stated their mutual "intent to execute final documents within 60 days." The letter of intent provided that CRMC would enter a seven year lease with Celtic for the Property at a rental rate of $1.60 per square foot with an escalation clause providing for a two percent increase in year two and a three percent increase per annum for years three through seven. Dr. Murphy agreed to enter into a five year agreement with CRMC to provide patient services at Livingston Rural Healthcare Center and to act as the clinics medical director.

Prior to executing the formal letter agreement, CRMC and Dr. Murphy's attorney negotiated the provisions in the letter of intent. Dr. Murphy's attorney recommended several changes to the letter to address various issues. The recommended changes were incorporated into the formal letter agreement. Evidence at trial established that the title of the agreement was changed from "Letter of Intent" to "Letter of Agreement" to clarify that the agreement would be a binding, valid contract. The evidence further established that Dr. Murphy expressed concern that Dr. Kelley may vacate suite 301A, and if so, Dr. Murphy wanted Celtic to receive a higher rental rate. To address this concern, the parties added language to the letter agreement to ensure that if Dr. Kelley vacated suite 301A, Celtic would enter into a new rental agreement with CRMC. The agreement further provided that Celtic was to pay to CRMC any remaining balance due from the doctors to CRMC for the initial build-out.

The formal letter agreement ("Letter Agreement"), dated May 14, 1999, signed by Celtic and CRMC, stated that the letter was to "Amemorialize our agreement concerning the lease of certain medical office space located at 301 Sleepy Hollow, Cleveland[,] Texas." The Letter Agreement referenced the Master Lease, which was attached as an exhibit and "incorporated . . . for all purposes." The Letter Agreement provided in part:

The formal letter agreement ("Letter Agreement"), dated May 14, 1999, signed by Celtic and CRMC, stated that the letter was to memorialize our agreement concerning the lease of certain medical office space located at 301 Sleepy Hollow, Cleveland[,] Texas. The Letter Agreement referenced the Master Lease, which was attached as an exhibit and incorporated . . .

for all purposes. The Letter Agreement provided in part:

The terms of the agreement are as follows:

1. Cleveland Regional Medical Center (CRMC) will occupy medical office space located at 301 Sleepy Hollow, Suite 301B, Cleveland, Texas, subject to the terms and conditions of the master lease between CRMC and Celtic Properties, dated July 15, 1994 as amended July 15, 1996.

2. In the event that Suite 301A is vacated during the term of the master lease described in paragraph 1, the parties agree:

a. The master lease shall terminate and be of no further force or effect.

b. CRMC and Celtic Properties shall enter into a Master Lease for the entire medical office space (approximately 7,661 sq. Ft.) Located at 301 Sleepy Hollow, Cleveland, Texas for a term to expire May 31, 2006. If the tenant in Suite 301–A vacates the premises, Celtic Properties shall have at least sixty (60) days, from the date the vacation starts, to obtain financing and enter into a new Master Lease that covers the entire medical office space, with CRMC subject to the same terms and conditions in Paragraph 2(c).

c. Rent during the term of the master lease described in paragraph 2(b) shall be set at $1.60 per square foot monthly.

During the term of the Master Lease described in Paragraph 2(b), rental rates shall be set at $1.60 per sq. [f]t. with an escalation clause providing for a two percent (2%) increase in year two (2) and an increase of three percent (3%) per annum for years . . . three through

seven, based upon a total agreed square footage of 7,661 sq. ft., payable in equal monthly installments.

d. Celtic Properties will pay to CRMC the entire unamortized amount of the build out of the building.

3. The above-referenced agreements will be prepared consistent with the customary format utilized by Cleveland Regional Medical Center, L.P.

When Dr. Murphy left to direct the Livingston Clinic, other physicians subleased suite 301B from CRMC. In April 2002, Dr. Murphy inquired of CRMC regarding the status of his repayment of the build-out costs for suite 301B. CRMC initially told Dr. Murphy that the build-out cost would be fully amortized in September 2002. However, CRMC later informed Dr. Murphy that the September 2002 date was incorrect and that the build-out cost would not be fully amortized until September 2003. Dr. Murphy testified at trial that another physician rented suite 301B from CRMC from 2002 until 2007.

In December 2003, Dr. Kelley gave CRMC notice that he would vacate suite 301A in February 2004. Dr. Murphy testified that CRMC did not inform him of Dr. Kelley's plan to vacate the leased premises. According to Dr. Murphy, he did not learn that Dr. Kelley had vacated suite 301A until June 2004. Dr. Murphy explained that pursuant to the Letter Agreement, once Dr. Kelley vacated suite 301A, the Master Lease terminated and CRMC was obligated to begin paying Celtic $1.60 a square foot in rental income. In June 2004, Dr. Murphy received a letter from then CEO of CRMC, Ron MacLaren, stating that a new physician was interested in leasing suite 301A and had requested that CRMC pay for certain renovations to the suite. Dr. Murphy testified that after receiving this letter, he scheduled a meeting

with MacLaren at the Property. According to Dr. Murphy, at the meeting he demanded the increased rent of $1.60 a square foot, which he contended he was due under the Letter Agreement. Dr. Murphy further testified that he and MacLaren discussed renovations to suite 301A to accommodate the new physician, as well as the execution of a new master lease agreement. Dr. Murphy stated that MacLaren agreed at the meeting to execute a new agreement. However, Dr. Murphy had no follow-up conversations with MacLaren regarding the new lease agreement or the higher rental rate because MacLaren subsequently left CRMC's employment.

Dr. Murphy testified that he later raised the issue of a new master lease and the higher rental rate CRMC owed Celtic under the Letter Agreement with the subsequent CEO of CRMC, Jude Torchia, and with Steve Courtier, a representative for CRMC. Around September of 2004, Dr. Murphy and his wife met with Torchia and Courtier to discuss these issues. Following this meeting, Dr. Murphy and his wife contacted Brian Russo, a representative of CHS, who had been employed with CRMC when the Letter Agreement was initially executed and was familiar with the transactions and history behind the agreement. Dr. Murphy faxed copies of his communications with MacLaren to Russo in hopes that Russo could help resolve the issue.

Dr. Murphy and his wife had a follow-up meeting with Torchia and Courtier in October 2004. At this point, Torchia and Courtier had been with CRMC for several months. Mrs. Murphy testified that Torchia and Courtier indicated they were still learning the business and had not focused on the lease issue, however, she and Dr. Murphy left the meeting with the understanding that the parties were working towards a resolution. Mrs. Murphy did not recall hearing anything else from

CRMC or CHS regarding the issue after the October meeting.

The record reflects no further action taken until February 2005, when Celtic made a demand for rent escalations on another property lease between the parties.[1] According to Mrs. Murphy, she hand delivered a demand to Courtier for rent escalation on another property, and Courtier responded that he would not agree to have CRMC pay rental increases on either property because his job was to make money for the hospital. Dr. Murphy testified that subsequent to learning of Courtiers position, he encountered Torchia at the hospital, and the two exchanged harsh words regarding the parties rental disputes. After this exchange, Murphy hired an attorney to represent him in his disputes with the hospital.

### The Water Intrusions

Dr. Murphy occupied suite 301B at the Property from 1995 until 1999. During this time, he recalled two instances of water intrusions. The first instance occurred around January 1996. Dr. Murphy testified water entered the building after a heavy rain. He immediately called a carpet company to clean up the water. Dr. Murphy stated that the company performed mold and mildew treatment, and he never experienced any problems with mold or other water damage from that incident. Later that same year, a heavier rain resulted in another water intrusion. Dr. Murphy testified that once again he immediately had the water cleaned up and never saw mold, mildew, or other water damage.

When Dr. Murphy vacated suite 301B in 1999, Dr. Stanus Law subleased the suite from CRMC. According to Dr. Murphy, Dr. Law never complained of water intrusions into the leased space. Thereafter, in 2003, Dr. Keith Spooner subleased suite 301B, and he never complained to Dr. Murphy about water intrusions in the building. However, Dr. Spooner testified that when he moved into suite 301B he noticed water would get into the waiting room, and he brought that to the attention of CRMCs maintenance department and they addressed the problem. In addition to the two occasions Dr. Murphy recalled where water got into the waiting room, Dr. Spooner recalled two additional instances of flooding in suite 301B. With respect to the first instance of flooding, Dr. Spooner immediately called the carpet company to extract the water and treat the carpets. The next day, Dr. Spooner notified CRMCs maintenance department of the flooding. Dr. Spooner testified that he was not aware of any damage to his suite resulting from the incident. Dr. Spooner did not notify Dr. Murphy of the incident. Dr. Spooner did, however, inform MacLaren that he had a water problem in suite 301B that he had resolved.

Dr. Spooner recalled the second water intrusion occurred in 2004, which made some of the carpet in suite 301B soggy. Again, Dr. Spooner called the carpet company to extract the water and treat the carpet. Dr. Spooner again notified CRMC of the water intrusion, but never spoke with Dr. Murphy. Dr. Spooner stated that he never saw any signs of mold or mildew in suite 301B following either of these incidents. Dr. Spooner never made Celtic aware of these incidents of water intrusion.

1. Defendants' exhibit 62, which made a demand for a rental increase on another property lease between Celtic and CRMC, known as the East Dallas lease, also referenced a dispute over the square footage at the Sleepy Hollow Property. The letter stated, "[t]he correct total square footage is 8000 sq. ft. We have been paid for 7661 sq. ft. The difference is 339 sq. ft. You indicated at our meeting that you would rectify this problem."

James Kelly, CRMCs director of engineering, also testified at trial. Kelly indicated that he is responsible for the maintenance of the facilities managed by CRMC. Kelly testified extensively about various water intrusions and leaks that occurred in suites 301A and 301B. He explained that the doctors leasing the premises contacted him to address various maintenance issues, such as roof leaks, leaks from the air conditioning lines, and flooding of the leased premises during heavy rain. Kelly testified that water would build up and come in underneath the wall of the premises while Dr. Stanus occupied suite 301B. Kelly also testified regarding a major flooding incident that occurred in suites 301A and 301B while Drs. Kelley and Spooner occupied them. In addition to the water intrusions, Kelly testified regarding a water heater that ruptured in the leased premises in early 2005.

At the time the water heater ruptured, suite 301A was vacant. Kelly testified that his wife discovered the water and notified him. Upon arriving at the Property and finding water spraying from the ruptured water heater in suite 301A, Kelly turned off the water and called a carpet cleaning company. Kelly testified that the carpet company extracted the water, cleaned the carpet, and replaced the water heater. Kelly further testified that following this incident, sheetrock, wallpaper, and flooring near the water heater needed to be replaced. According to Kelly, the lower four feet of the walls needed to be repaired before another physician could sublease the suite.

Kelly testified that he did not attempt to inform Dr. Murphy of the incident involving the water heater and did not know if anyone else from CRMC informed him. However, Dr. Murphy testified that a couple of months after the water heater ruptured, Kelly informed him that the water heater had ruptured and that water had been pouring out of suite 301A. At that time, Dr. Murphy walked through suite 301A and found it "obvious that something major had happened[.]" Dr. Murphy testified that when he walked through the suite, he noticed an odor and "a lot of water stain." Dr. Murphy testified that the room where the water heater ruptured was "devastated," leaving the room with water stains, mold, and "just a lot of destruction." Dr. Murphy stated that he asked Kelly to get suite 301A cleaned up, and Kelly said he would take care of it.

The trial court admitted photographs of the damage to suite 301A, which depicted, among other things, major water stains, torn wallpaper, exposed slab, mold damage, and abandoned "hazardous waste" containers. Dr. Murphy testified that he hired an expert to evaluate the suite to determine the cause of the mold damage and, thereafter, hired contractors to determine what it would cost to remove and replace the moldy materials.

Kelly told Dr. Murphy that appellants also hired someone to evaluate suite 301A for mold damage and that Kelly's supervisors told him to get busy "getting the place in shape." Dr. Murphy suggested that the parties work together to remediate the damage in suite 301A; however, in July 2007, Dr. Murphy learned that appellants had already started remediation projects in both suites. According to Dr. Murphy, a "full blown remediation [was] going on in Suite A and B." Dr. Murphy stated that he was "stunned" that appellants had gone into suite 301B and started a remediation project because he was not aware of any problems in suite 301B. At the time of trial in October 2007, appellants had not fully restored suite 301B to the condition it was in before they undertook the remediation project as appellants had ceased all repairs. Dr. Murphy testi-

fied that he was unable to lease the space in its condition, and that the appellants' remediation project had interfered with his ability to use the Property.

## ISSUE ONE

■ In issue one, appellants argue that the trial court erred by rendering judgment in favor of Celtic on jury question one because the evidence was legally insufficient to show that the May 14, 1999 Letter Agreement was a valid contract. In support of issue one, appellants argue that the Letter Agreement is an "unenforceable agreement to agree" in the future and is not a valid, binding contract. Appellants raised this issue in their motion for judgment notwithstanding the verdict ("JNOV").

■ A JNOV is proper only when a directed verdict would have been proper. *Fort Bend Cty. Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991). In *Rush v. Barrios,* the court stated:

'No evidence' exists, and a judgment notwithstanding the verdict should be entered, when the record discloses one of the following: (1) a complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact.

56 S.W.3d 88, 94 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (citing *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990)). Stated differently, a JNOV is proper only when there is no evidence to support an issue or conversely when the evidence establishes an issue as a matter of law. *Id.* (citing *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19 (Tex.1987)). To determine whether the trial court erred in denying a motion for JNOV based on the legal insufficiency of the evidence, we consider only the evidence and the reasonable inferences that support the jury's answers, disregarding all contrary evidence and inferences. *Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex. 2003). We must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). "If more than a scintilla of evidence supports the jury finding, it must be upheld." *Mancorp., Inc. v. Culpepper,* 802 S.W.2d 226, 228 (Tex.1990).

■ Jury question one asked the following:

Did CRMC and Celtic agree that in the event Suite 301 A was vacated during the term of the Master Lease and resulting termination of the Master Lease that the parties would be bound by the May 14, 1999 Letter Agreement.

The jury answered "yes." " 'Whether an agreement is legally enforceable or binding is a question of law.' " *America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 622 (Tex.App.-San Antonio 1996, writ denied) (quoting *Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768, 814 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.)); *see also Komet v. Graves,* 40 S.W.3d 596, 601 (Tex.App.-San Antonio 2001, no pet.) (concluding that an issue regarding whether material terms were left open for future negotiation making the contract unenforceable may not be challenged on the basis of insufficient evidence).

■ In general, a contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22

S.W.3d 831, 846 (Tex.2000). A jury may not be called upon to determine whether an agreement "fails for indefiniteness" as this is a question of law determined by the court. *Samaras,* 929 S.W.2d at 622. A binding contract may be formed if the parties agree on the material terms, even if they leave other provisions for later negotiation. *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 556 (Tex.1972); *see also* 1 ARTHUR CORBIN, CORBIN ON CONTRACTS § 29, at 93–95 (1963). When a contract leaves essential terms open for future negotiation and adjustment, there is no binding contract that can be enforced. *See T.O. Stanley Boot, Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992). A letter agreement may be binding even though it refers to the drafting of a future, more formal agreement. *See Foreca, S.A. v. GRD Dev. Co.,* 758 S.W.2d 744, 746 (Tex. 1988).

■ "No particular form of words are necessary to create a lease." *Castroville Airport, Inc. v. City of Castroville,* 974 S.W.2d 207, 212 (Tex.App.-San Antonio 1998, no pet.) (citing *Wilson v. Wagner,* 211 S.W.2d 241, 243 (Tex.Civ.App.-San Antonio 1948, writ ref'd n.r.e.)). The May 14, 1999 Letter Agreement references, attaches, and incorporates the prior Master Lease documents, supplies the address of the leased premises, the signatures of both parties, the square footage of the leased space, the lease term, and the rental rate. Celtic submitted evidence showing the negotiations between the parties during the formation of the Letter Agreement and the parties' mutual intent to make it a binding and enforceable agreement. The agreement leaves no essential term open for future negotiation. Ancillary matters, not essential to the agreement but necessary for a more formal agreement, are expressly provided in paragraph 3 to "be prepared consistent with the customary format utilized by Cleveland Regional Medical Center, L.P."

■ Though a jury may not be called upon to determine whether an agreement is legally enforceable, whether parties intend to be bound by the terms of an agreement is a question of fact for the jury. *Meru v. Huerta,* 136 S.W.3d 383, 390 (Tex.App.-Corpus Christi 2004, no pet.). In the present case, this question was answered in the affirmative by the jury. Considering all of the evidence favorable to the jury's finding and disregarding evidence to the contrary unless a reasonable factfinder could not, we hold that the evidence was legally sufficient to support the jury's finding that the parties intended to be bound by the May 14, 1999 Letter Agreement. *See City of Keller,* 168 S.W.3d at 827. We overrule CRMC's first issue.

### ISSUE TWO

■ In issue two, appellants assert that the trial court erred by rendering judgment in favor of Celtic on jury question one because the evidence established CRMCs affirmative defense of accord and satisfaction. After the jury's verdict appellants sought a new trial *inter alia* on this basis. In their motion for new trial, appellants argued that the court committed reversible error by refusing to submit a jury question on accord and satisfaction.

"Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment[.]" TEX.R. CIV. P. 278. Appellants failed to submit a jury question on their affirmative defense of accord and satisfaction. *See id.* "Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no ele-

ment of which is submitted or requested are waived." TEX.R. CIV. P. 279; *see also Bank of El Paso*, 847 S.W.2d at 222–23. Unless appellants' affirmative defense of accord and satisfaction was conclusively established by the evidence presented at trial, the defense is waived. *See* TEX.R. CIV. P. 279.

 Appellants argue that accord and satisfaction is established as a matter of law because Dr. Murphy accepted and cashed rental payments in the lesser amount owed under the Master Lease through May 2006, even after learning in June 2004 that Dr. Kelley had vacated suite 301A. "An accord and satisfaction exists when parties agree to discharge 'an existing obligation in a manner other than in accordance with the terms of their origi-. nal contract.'" *Richardson v. Allstate Tex. Lloyd's*, 235 S.W.3d 863, 865 (Tex. App.-Dallas 2007, no pet.) (quoting *Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 788 (Tex.App.-Dallas 2002, pet. denied)). This defense involves a new contract, either express or implied, wherein the parties agree that the existing obligation is released by means of a lesser payment, which is tendered and accepted. *Id.; see also Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex.1969). The evidence must establish an agreement between the parties that the lesser amount paid "was in full satisfaction of the entire claim." *Jenkins*, 449 S.W.2d at 455. Thus, there must be an "unmistakable communication to the creditor that tender of the reduced sum is upon the condition that acceptance will satisfy the underlying obligation." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 863 (Tex.2000) (citing *Jenkins*, 449 S.W.2d at 455). In *Pate v. McClain*, we elaborated on this standard as follows:

> An unmistakable communication must be made by one party that the tender of a lesser sum is undoubtedly and unques-

tionably upon the condition and premise that the acceptance of the lesser sum will constitute complete satisfaction of the underlying obligation and this clearly communicated condition must be plain, definite and certain. There should be a statement that accompanies the tender of the lesser sum, which statement also must be so clear and so explicit and so complete that the statement is simply not susceptible of any other interpretation but one of complete accord and complete satisfaction.

769 S.W.2d 356, 361–62 (Tex.App.-Beaumont 1989, writ denied). Acceptance of a tendered check, without more, is not enough to constitute accord and satisfaction. *Id.* The parties must mutually assent to form a new agreement to satisfy the original obligation, and the parties' intent is controlling. *See Richardson*, 235 S.W.3d at 865.

CRMC relies on *Ostrow v. United Business Machines*, for the proposition that "[w]here [a] check is tendered in an effort to discharge or modify an existing and disputed obligation between the parties, the acceptance of the check constitutes an accord and satisfaction." 982 S.W.2d 101, 104 (Tex.App.-Houston [1st Dist.] 1998, no pet.). In *Ostrow*, the plaintiff returned a computer she had purchased to UBM and asked for a full refund. *Ostrow*, 982 S.W.2d at 103. After signing a document entitled "Full Payment and Release" she was refunded the purchase price minus a fifteen percent restocking fee. *Id.* Written on the front of the refund check UBM gave plaintiff for the lesser amount, were the words "full payment and release." *Id.* The back of the check stated "Endorsement or deposit of this check represents a release of all claims by Ostrow & Associates against UBM." *Id.* Plaintiff endorsed and deposited the check. *Id.*

In holding that the plaintiffs acceptance of the check constituted an accord and satisfaction, the court stated, "[w]hen a check listing certain conditions is tendered to a party and the conditions are accepted, a contract is formed when the check is cashed or deposited." *Id.* at 104. In *Ostrow,* unlike in the present case, there was an unmistakable communication by one party that tender of the lesser sum was conditioned on the premise that acceptance of the lessor sum would constitute "full payment" and "release of all claims by Ostrow ... against UBM." *Id.* at 103. Appellants also rely on *Metromarketing Servs., Inc. v. HTT Headwear, Ltd.,* 15 S.W.3d 190 (Tex.App.-Houston [14th Dist.] 2000, no pet). Like the check accepted in *Ostrow,* the check accepted and cashed by the plaintiff in *Metromarketing* bore a notation stating that it constituted "final payment for commissions." *Metromarketing Servs. Inc.,* 15 S.W.3d at 197.

Here, there is evidence that Dr. Murphy continued to accept the rental payments under the Master Lease while attempting to enforce the Letter Agreement. The check stubs offered into evidence by CRMC did not expressly provide that acceptance of such checks constituted a settlement of· the parties' rental dispute. There is no evidence of a statement that tender of the lesser rental amount was "undoubtedly and unquestionably" on the condition that acceptance would constitute complete or full satisfaction of CRMC's obligation to pay a higher rental rate under the Letter Agreement. *See Pate,* 769 S.W.2d at 361–62; *see also Jenkins,* 449 S.W.2d at 455. Appellants failed to conclusively establish their affirmative defense of accord and satisfaction, therefore, this defense is waived. We overrule issue two.

**ISSUE THREE**

 In issue three, appellants assert that the trial court erred by improperly excluding an alleged admission by Celtic that the Master Lease was in "full force and effect." Specifically, appellants argue that the trial court erred in excluding a string of emails between Celtics prior counsel and CRMC's counsel, dated prior to the filing of the underlying lawsuit.

On March 17, 2005, counsel for Celtic sent a letter to Steve Courtier concerning the rights and obligations of the parties with respect to two separate properties owned by Celtic and leased by CRMC, "The East Dallas Lease" [2] and "The Sleepy Hollow Lease." With respect to the Sleepy Hollow Property, Celtic's counsel asserted that the initial term of the lease had expired, but made no reference to the May 14, 1999 Letter Agreement. CRMC's counsel responded to Celtic's letter by email dated May 24, 2005, indicating CRMC's position with regard to the two leases. CRMC's counsel asserted, among other things, that the Master Lease term automatically renewed, extending the Master Lease on the Sleepy Hollow Property until June 30, 2008. Counsel further stated as to the Master Lease, "[c]ontrary to your assertion in your letter, the lease is fully current, in full force and effect and there is no holdover occurring."

Celtic's counsel responded via email and asked for additional time to examine the leases in light of CRMC's analysis. After receiving no response from Celtic's counsel, CRMC's counsel sent another email regarding "Lease Issues with Cleveland Regional Medical Center" asking Celtic to advise CRMC of Celtic's position. In a response dated October 6, 2005, Celtic's counsel stated:

---

**2.** The East Dallas Lease is not at issue in the underlying lawsuit.

Sorry this drug out so long. I agree with your analysis in your May 24th e-mail. Please calculate the adjustment on the East Dallas lease for payment and I will do the same. I look forward to hearing from you.

"Whether to admit or exclude evidence is a matter committed to the trial court's sound discretion." *Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 220 (Tex.2001) (citing *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995); *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989)). "To reverse a judgment based on a claimed error in admitting or excluding evidence, a party must show that the error probably resulted in an improper judgment." *Id.; see also* TEX.R.APP. P. 44.1(a); *Alvarado,* 897 S.W.2d at 753; *McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992). We must review the entire record to determine if the excluded evidence probably resulted in the rendition of an improper judgment. *McCraw,* 828 S.W.2d at 758; *Gee,* 765 S.W.2d at 396.

Appellants contend that Celtic's counsel's statement in the email, "I agree with your analysis in your May 24th email," constituted an admission by a party opponent and equated to a concession by Celtic "that the parties' contractual relationship was defined by the Master Lease" as opposed to the Letter Agreement. Initially, appellants rely on this court's holding in *Westchester Fire Ins. Co. v. Lowe,* 888 S.W.2d 243, 252 (Tex.App.-Beaumont 1994, no writ) for the proposition that "allegations and statements made by the party's authorized attorney are the party's state-

ments." Such reliance is misplaced as Lowe concerned judicial admissions by an attorney filing pleadings with the court containing assertions of fact and is distinguishable. The email in question here was not filed as part of a pleading in a court proceeding.

Nevertheless, we conclude the emails were admissible. While the attorney's statement was in the nature of an opinion rather than a declaration of fact, as long as the agent's statement is made during the existence of the employment relationship and concerns a matter within the scope of that employment, it is admissible against the principal, even if the employee had no authority to speak for the principal. *See* TEX.R. EVID. 801(e)(2)(D); *see also Edwards v. Tex. Empl. Comm'n,* 936 S.W.2d 462, 467 (Tex.App.-Fort Worth 1996, no writ). Thus, the attorney's statement was admissible against his client, Celtic.

■■■ Appellants assert that they attempted to introduce this evidence during Dr. Murphys cross-examination and again during the direct examination of CRMCs counsel who testified about the reasonableness of Celtics attorneys fees, but that the trial court improperly excluded the evidence on hearsay grounds. While our review of the record shows there was much confusion surrounding the admissibility of this evidence, the record reveals that defendants' exhibit 68, which consists of the string of email correspondence between counsel, was admitted into evidence but was not offered or referenced during counsels cross-examination of Dr. Murphy at trial.[3]

---

**3.** During a pretrial conference, the trial court initially sustained a hearsay objection to defendants exhibit 68. However, after a lengthy discussion on the record, the trial court reversed its position and overruled Celtics hearsay objection to exhibit 68, and pre-admitted the exhibit. The trial court reiterated its ad-mission of exhibit 68 when defendants offered and had admitted defendants' exhibit 80, a subsequent communication by Celtic's counsel. Appellants contention that the trial court sustained Celtics hearsay objection to exhibit 68 on two separate occasions is not supported by the record.

The record reveals that the only time CRMC sought to elicit testimony regarding exhibit 68 was during the direct examination of CRMC's expert witness, Nick Simms, to rebut the reasonableness of Celtics stated attorneys fees. When CRMC attempted to reference the emails during the direct examination of Simms, Celtic objected and incorrectly stated that the trial court had "specifically excluded [the emails] on the basis of hearsay and lack of reliability."[4] CRMC argued exhibit 68 was relevant to the issue of attorneys fees because if Celtics lawyer agreed with CRMCs analysis that the Master Lease was still in effect, Celtic was not justified in filing the lawsuit and thus, no amount of attorney's fees would be reasonable or necessary under such circumstances. Counsel for CRMC offered the document pursuant to Rule 705 of the Texas Rules of Evidence as facts relied upon by Simms in forming his expert opinion as to the reasonableness of Celtics attorneys fees. *See* TEX.R. EVID. 705. Counsel for Celtic objected on the basis that the document was irrelevant, highly prejudicial, and constituted hearsay. The trial court sustained the objection.

■■■ As set forth above, Exhibit 68 was admitted into evidence during the pretrial conference. However, assuming the trial court excluded the exhibit, as asserted in the dissent, and that the jury never considered it, and its exclusion was error, appellants must still show that the error was harmful. *See* TEX.R.APP. P. 44.1. Generally, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted by the trial court. *Texas Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000); *Alvarado,* 897 S.W.2d at 753–54. Ordinarily, an appellate court

will not reverse a trial court's judgment because it erroneously excluded evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *Interstate Northborough P'ship,* 66 S.W.3d at 220; *Able,* 35 S.W.3d at 617–18; *Reina v. Gen. Accident Fire & Life Assurance Corp.,* 611 S.W.2d 415, 417 (Tex.1981) (holding the exclusion of cumulative evidence is not reversible error). Error from the improper exclusion of cumulative evidence is generally deemed harmless. *See Interstate Northborough P'ship,* 66 S.W.3d at 220. Moreover, an admission by a party opponent, being merely a piece of evidence, is not conclusive against the party opponent; it is simply admissible and the party may offer evidence in contradiction or explanation of it. *See* 2 STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 801.7 (3d ed. 2002).

Appellants argue that the October 6th email contains an admission that the Master Lease was in "full force and effect." However, the email is ambiguous and only states that the attorney agrees with counsel's "analysis" in a prior email, presumably the May 24th email. It is unclear what analysis Celtic's attorney intended to reference as the May 24th email dealt with at least two issues. Notably, in the email Celtic's counsel requested that CRMC's counsel calculate the adjustment on the East Dallas lease for payment and makes no mention of the Sleepy Hollow lease. Additionally, appellants admitted exhibit 65, correspondence from Celtic's counsel to CRMC dated March 17, 2005, regarding rental disputes involving both the East Dallas and Sleepy Hollow properties, and cross-examined Dr. Murphy about counsel's failure to mention the May 14, 1999 Letter Agreement in the original corre-

---

**4.** As explained in footnote 3, the trial court did not exclude exhibit 68 at the pretrial hearing in this case, but admitted the exhibit over plaintiff's objection.

spondence to counsel for CRMC. Further, Dr. Murphy was questioned concerning a letter from his wife to the hospital, written around the same time period and asking for a higher rental rate, which also omitted any reference to the Letter Agreement. Importantly, and in direct contravention to appellants' position that counsel for Celtic admitted the parties were bound by the Master Lease and not the Letter Agreement, CRMC offered and had admitted into evidence defendants' exhibit 80, a letter dated February 16, 2006, from Celtic's counsel to CRMC's counsel, which specifically references the Letter Agreement and asserts its application to the lease dispute. Therefore, while the email is probative of appellants' affirmative defenses of waiver and ratification, it does not establish either waiver or ratification as a matter of law.

CRMC's expert Simms testified, in the alternative, to a lesser sum of reasonable attorney's fees should the jury have chosen to reject his opinion that no amount of attorney's fees were reasonable in light of the attorney's communication. We hold the email correspondence reflected in exhibit 68 was merely cumulative and appellants did not reasonably show that the exclusion of this evidence probably caused the rendition of an improper judgment. We overrule issue three.

### ISSUES FOUR AND FIVE

Issues four and five assert errors in the jury charge regarding the submission of Celtic's breach of contract claim and will be addressed together. "The trial court has broad discretion in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury." *McIntyre v. Commn. for Lawyer Discipline,* 247 S.W.3d 434, 443 (Tex.App.-Dallas 2008, pet. denied). A trial court is required to submit controlling questions to the jury if the issue is properly pleaded and supported by the evidence. *See* Tex.R. Civ. P. 278; *see also Triplex Commc'ns, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995). A trial court has more discretion when submitting instructions to the jury questions than when submitting questions as part of the jury charge. *McIntyre,* 247 S.W.3d at 443.

Rule 274 of the Texas Rules of Civil Procedure addresses objections and requests related to the jury charge. It provides as follows:

> A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections. When the complaining party's objection, or requested question, definition, or instruction is, in the opinion of the appellate court, obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests, such objection or request shall be untenable. No objection to one part of the charge may be adopted and applied to any other part of the charge by reference only.

Tex.R. Civ. P. 274. To preserve error, the complaining party must specifically object, clearly identify the error, and explain the grounds for the objection. *In re B.L.D.,* 113 S.W.3d 340, 349 (Tex.2003). The primary purpose served by objections to a court charge is to apprise the trial court of error, thus affording the court the opportunity to correct the error. *See Wilgus v. Bond,* 730 S.W.2d 670, 672 (Tex.1987); *Carr v. Weiss,* 984 S.W.2d 753, 766 (Tex. App.-Amarillo 1999, pet. denied). Where a party's objections are too general and too profuse it cannot be said that the trial court was fully cognizant of the grounds of

the objection and deliberately chose to overrule it. *See Monsanto Co. v. Milam,* 494 S.W.2d 534, 536–37 (Tex.1973). Thus, where a party's objection is obscured or concealed among voluminous, general, unfounded objections, it will not preserve error. *See* TEX.R. CIV. P. 274.

### Issue Four

In issue four, appellants contend that the trial court erred in submitting jury question one and its accompanying instructions to the jury. Specifically, appellants argue that question one was improperly submitted because "it requires the jury to make a factual finding on a question of law, constitutes an impermissible comment on the weight of the evidence, and fails to address patent ambiguities in the May 14, 1999 Letter." Further, appellants contend that the instructions accompanying jury question one "are unnecessary instructions on matters of law, and improperly 'nudge' the jury towards a finding in Plaintiffs favor." In conjunction with this issue, appellants argue that the trial court erred in failing to include a question on ambiguity in the jury charge.

At the charge conference, appellants objected to jury question number one and its instructions as follows:

> Your Honor, defendants object to this question because it's an improper comment on the evidence.
>
> It tends to nudge the jury into a finding in favor of one party or the other. Furthermore, its not supported by the evidence. Its submission is improper. There is also no supporting

Texas case law or cites in the pattern jury charge in support of this question.

> As far as the instructions, again its improper submissions. They mischaracterize the facts and are unnecessary comments on the evidence. Again, they tend to nudge the jury in favor of the plaintiff, fail to help the jury understand the question.
>
> Again, the instructions fail to cite any Texas case with a pattern jury charge. The defendants submit their questions—proposed questions Number 1 and Number 2 and request that they be used instead of Celtic's question Number 1, present proper questions and instructions to the jury, specifically question Number 1 and ask the jury to resolve the termination issue.
>
> And question Number 2 gives the jury the opportunity to determine the parties' intent with the May 14th, '99 letter and to resolve numerous ambiguities or ambiguous terms contained in that letter. So, we submit that and request that the court give us these two questions.

The trial court overruled the objections and denied appellants' request to submit their proposed jury questions number one and two instead of Celtic's proposed jury question one.

 First, we note that appellants failed to submit a jury question on their affirmative defense of ambiguity.[5] *See* TEX.R. CIV. P. 278 ("Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording,

---

5. Appellants contend that they "submitted a question on the issue of ambiguity, which the court denied." The proposed jury question number two asked: "Did Celtic and CRMC agree that when the Master Lease terminated, the May 14, 1999 Letter would become the new master lease between the parties?" It also contained an instruction stating that it

was the jury's duty in answering proposed question two to interpret the pertinent contract language. Contrary to appellants' assertion, its proposed question two and accompanying instructions do not ask the jury whether the Letter Agreement is ambiguous, nor does it instruct the jury on the issue of ambiguity.

has been requested in writing and tendered by the party complaining of the judgment....."). Because the evidence presented at trial does not conclusively establish that the Letter Agreement was ambiguous, this complaint was not preserved for review. TEX.R. CIV. P. 279. Second, appellants did not object to jury question one on the basis that it required the jury to make a factual finding on a question of law. Even if appellants had preserved this complaint for our review, we find it without merit.

■ While appellants did object to jury question one and its instructions on the basis that they constitute an impermissible comment on the evidence and nudge the jury in favor of one party, appellants' objection does not clearly and distinctly identify the alleged defect or explain the grounds for the complaint. *See* TEX.R. CIV. P. 274. Appellants did not explain how jury question one and its instructions tend to favor one party. In addition, appellants did not object to the instructions at trial on the basis that they were "unnecessary instructions on matters of law," nor does the objection attempt to explain how or why the instructions were unnecessary. *See id.*

■ Appellants submitted a proposed jury question asking the jury to determine the termination issue. However, tendering a proposed jury question or instruction will not suffice to preserve error when a proper objection has not been made to the question or instruction submitted. *See Kirkpatrick v. Mem'l Hosp. of Garland,* 862 S.W.2d 762, 769 (Tex.App.-Dallas 1993, writ denied); *see also Carr v. Weiss,* 984 S.W.2d at 766;[6] *Boorhem–Fields, Inc. v. Burlington N. R.R. Co.,* 884 S.W.2d 530, 535 (Tex.App.-Texarkana 1994, no writ); *Schutz v. Southern Union Gas Co.,* 617 S.W.2d 299, 302 (Tex.Civ. App.-Tyler 1981, no writ). "A request for submission is required to preserve the right to complain of a trial court's failure to submit a question; whereas, an objection is required to preserve a complaint as to a defective question." *Hartnett v. Hampton Inns, Inc.,* 870 S.W.2d 162, 166 (Tex.App.-San Antonio 1993, writ denied) (citing TEX.R. CIV. P. 274, 278). Appellants did not specifically object to jury question one on the basis that it contained the "resulting termination" language, nor did they explain to the trial court why or how the "resulting termination" language rendered the question defective. *See* TEX.R. CIV. P. 274. We find that appellants' objection to jury question one and its instructions was insufficient to preserve the errors appellants assert in issue four. *See id.* We overrule issue four.

### Issue Five

Issue five addresses jury question three, which asked the jury, "[w]as CRMCs failure to comply with the Letter Agreement excused?" Jury question three included various instructions on waiver, Celtic's failure to comply with a material obligation of the agreement, waiver of non-compliance,

6. In *Carr,* the court explained:
 Objections to the charge and requests for submission of issues are not alternatively permissible methods for complaining of the charge. Because a request for another charge is not a substitute for an objection, in the absence of a specific objection to the submitted question and instruction, the tender of a correct question is not sufficient to preserve error, even if a defectively worded special instruction is contained in the courts proposed charge. Moreover, it is the rule that if a trial courts charge fairly and fully presents all controlling questions to the jury, it is not error to refuse to submit additional issues or instructions which are mere shades or variations of the questions already submitted.
 984 S.W.2d at 766 (citations omitted).

circumstances under which CRMC's performance would be excused, and ratification. Appellants argue on appeal that the trial court erred in failing to submit with jury question three, CRMC's proposed jury instructions on its affirmative defense of ratification and failure of condition precedent. During the charge conference, appellants objected to jury question number three as follows:

> Plaintiffs question Number 3, defendants object to this question. Plaintiffs proposed instructions omit defendants valid affirmative defenses or defense of condition precedent, unnecessary comments in the law.

> It will only confuse the jury. Again, it tends to nudge the jury in favor of the plaintiff. The instructions will not help the jury understand question Number 3.

> At this time we submit our proposed question Number 4 and request that it be used instead of plaintiffs Number 3. It clearly sets out proper elements for defendants affirmative defenses.

Appellants proposed instructions on ratification and failure of condition precedent were submitted with its proposed jury question four, which asked, "[w]ere CRMCs obligations in connection with the May 14, 1999 Letter excused?" The trial court denied appellants' request to have this proposed question and instructions submitted in place of jury question three.

■ Significantly, the trial court submitted instructions on the defense of ratification. Appellants' objection at trial did not specifically assert that the trial court's submitted instructions on ratification were improper or incomplete. *See* TEX.R. CIV. P. 274; *Garza v. Southland Corp.*, 836 S.W.2d 214, 218 (Tex.App.-Houston [14th Dist.] 1992, no writ) ("A mere request to submit a different instruction or issue [other] than that proposed by the court does not sufficiently point out the specific objectionable matter and will not be considered an 'objection' for the purposes of Rule 274."). Generally, a request for a different instruction is not a substitute for an objection and does not preserve error. *See Hernandez v. Montgomery Ward & Co.*, 652 S.W.2d 923, 925 (Tex. 1983), *overruled on other grounds* by *Acord v. General Motors Corp.*, 669 S.W.2d 111 (Tex.1984); *but see State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 240–41 (Tex.1992) (holding a request can serve as an objection for preservation purposes if the trial court is made aware of the complaint and issues a ruling). Therefore, appellants waived any complaint regarding the courts submitted ratification instruction.

■ Appellants also argue in conjunction with issue five that the trial court erred in refusing to submit their proposed instruction on the defense of condition precedent. Appellants specifically objected to jury question three on the basis that the question omitted instructions on CRMCs affirmative defense of condition precedent. In addition, appellants submitted to the trial court a set of proposed instructions on the affirmative defense of condition precedent. *See* TEX.R. CIV. P. 278.

■ A jury instruction is proper when it assists the jury, accurately states the law, and is supported by the pleadings and evidence. *McIntyre*, 247 S.W.3d at 446. However, "[a]n incorrect jury instruction is grounds for reversal only if it likely caused the rendition of an improper verdict." *Id.* at 444 (citing TEX.R.APP. P. 44.1(a) and *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex.2002)). Thus, when a trial court denies the request to include an instruction, the question on appeal is whether the proposed instruction was reasonably necessary to enable the

jury to render a proper verdict. *Id.* at 446. CRMC tendered the following proposed instruction on its affirmative defense of condition precedent with its proposed jury question number four:

> Failure to comply by CRMC may be excused by Celtics failure to perform a condition precedent.

> 'A condition precedent may be either a condition to the formation of a [contract] or to an obligation to perform an existing agreement. Conditions may, therefore, relate either to the formation of contracts or to liability under them.' Conditions precedent to an obligation to perform are acts or events that are to occur after the contract is made and that must occur before there is a right to immediate performance and before there can be a breach of contractual duty. Although no particular words are necessary to create a condition, terms such as 'if,' 'provided that,' and 'on condition that,' usually connote a condition rather [than] a covenant or promise. Absent such a limiting clause, whether a provision represents a condition or a promise must be gathered from the contract as a whole and from the intent of the parties.

In this connection, the May 14, 1999 Letter contains the following language:

> *If the tenant in Suite 301–A vacates the premises, Celtic Properties shall have at least [sic] sixty (60) days, from the date the vacation starts, to obtain financing and to enter into a new Master Lease that covers the entire medical office space, with [CRMC] subject to the same terms and conditions of Paragraph 2(c).*

You must determine whether the above language was a condition precedent to CRMCs obligation to pay higher rents to Celtic.

■ Appellants argue that the Letter Agreement places two conditions on the parties entering into a master lease: (1) that Dr. Murphy obtain financing (to pay back the unamortized cost of the build-out); and (2) that Celtic enter into a new master lease with CRMC. We disagree. "A condition precedent is either a condition to the initial formation of a contract or a condition to an obligation to perform an existing agreement." *Samaras,* 929 S.W.2d at 627.

The only condition to the parties' performance under the Letter Agreement was Dr. Kelley vacating suite 301A. The requirements that Celtic obtain financing, if necessary, to pay off the unamortized portion of the build-out costs, and that the parties enter into a new master lease were obligations or covenants to be performed under the Letter Agreement, not conditions to the parties obligation to perform under the Letter Agreement. *See generally id.* We conclude that CRMCs requested instruction on its affirmative defense of condition precedent was not reasonably necessary to enable the jury to properly answer jury question number three. We overrule issue five.

### ISSUE SIX

■ In issue six, appellants complain that the trial court erred by submitting a defective question and instruction on Celtics negligence claim. The trial court submitted jury question number eight as follows:

> Did the negligence, if any, of the following persons proximately cause the damage, if any, to the premises?
> a. CRMC _____
> b. CHS _____
> c. CHS/CHS _____

Appellants objected to this question in part on the basis that the jury question failed to include Celtics negligence, if any. Appel-

lants tendered a proposed question submitting the negligence of all the parties including Celtic. Appellants also asked to submit a question with respect to comparative negligence, and tendered a proposed question to the court.

Appellants pleaded the affirmative defense of contributory negligence. *See* Tex.R. Civ. P. 94. Appellants also pleaded that Celtic's claims were "barred, in whole or in part, by the doctrine of proportionate responsibility and contribution." At the charge conference, Celtic argued that the statute of limitations barred any claim of negligence against Celtic. The trial court denied appellants request for a question submitting Celtics negligence for the jury's consideration. On appeal, Celtic contends that any claim for negligence against Celtic is barred by limitations and that there is no evidence to support a jury question on Celtics negligence. We disagree.

The defense of limitations does not generally apply to defensive theories such as contributory negligence. *See Villages of Greenbriar v. Torres,* 874 S.W.2d 259, 266 (Tex.App.-Houston [1st Dist.] 1994, writ denied) ("As a general rule, limitations statutes do not apply to defenses."); *see also Morriss–Buick Co. v. Davis,* 127 Tex. 41, 91 S.W.2d 313, 314 (1936). Therefore, limitations may not act as a bar to the submission of Celtic's contributory negligence to the jury. Additionally, section 33.003 of the Texas Civil Practice & Remedies Code mandates that the trier of fact determine the percentage of responsibility by each claimant and defendant "causing or contributing to cause in any way the harm for which recovery of damages is sought," where there is sufficient evidence in the record to support the submission. Tex. Civ. Prac. & Rem.Code Ann. § 33.003 (Vernon 2008). The trial court must submit questions, instructions, and definitions that are raised by the pleadings

and the evidence. Tex.R. Civ. P. 278. However, the trial court is not obligated to submit a jury question unless there is more than a scintilla of evidence to support the submission of the issue to the jury. *See Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992) (citing *Roy v. Howard–Glendale Funeral Home,* 820 S.W.2d 844, 846 (Tex.App.-Houston [1st Dist.] 1991, writ denied)).

Multiple witnesses testified regarding the water intrusions that occurred on the Property. Both Celtic and CRMC's experts attributed some of the mold damage on the Property to water intrusions. Celtic argues that each time it was notified of a water problem Celtic repaired the problem, including cleaning, drying, and spraying for mold and mildew. Celtic argues that no witnesses testified that it was negligent, breached a duty, or proximately caused the damage to the Property, therefore, appellants presented no evidence that Celtic was negligent in maintaining the building.

Dr. Murphy testified that it was Celtic's responsibility to take care of issues with the roof and the structure of the building under the terms of the lease agreement. Celtic's expert witness, Daniel Bridge, a project manager with Rimkus Consulting Group, testified regarding a mold assessment for suite 301A that he performed in July 2006. Bridge concluded the following moisture sources contributed to the mold damage in suite 301A: a leak in the plumbing supply line to the water heater, a toilet overflow in the north restroom, water condensation on HVAC components, photo development solution leaks in the dark room, and an active leak in the fire water supply pipe connection. Bridge attributed a substantial portion of the mold damage in suite 301A to the water heater rupture. In July 2007, following mold assessment and remediation in both suites

by Terracon Consulting Engineers ("Terracon"), Dr. Murphy asked Bridge to perform an assessment of suite 301B, just as he had previously done in suite 301A. Bridge identified mold remaining in suite 301B that he believed was the result of plumbing leaks, windblown rain, and a water heater leak.

CRMC's expert witness, Henry Hermis testified regarding his May 2007 evaluation of the Property and the "different sources of moisture" that caused the mold damage to the Property. Hermis testified that water from adjacent buildings drains toward the Property and collects alongside the building. Hermis observed "a lot of mold damage to the building" and recalled that he had been told there had been flooding in the building caused by both rising water and a ruptured water heater. Hermis stated that the building is "very low on the site" and that on occasion water gets into the building. Hermis noted that he was aware of invoices dating back to 1996 that indicate water had been extracted from suites 301A and 301B. Hermis noted deposition testimony by James Kelly, wherein Kelly referenced water seeping into the building through the slab. Hermis also relied on the deposition testimony of Dr. Spooner wherein Dr. Spooner discussed incidents of flooding in 2003 and 2004.

Hermis testified that "rising water [and] flooding from the surrounding areas or outside the building" was a substantial source of moisture. Hermis criticized Bridge's opinion on the cause of the mold damage in suite 301A because Bridge failed to "mention anything about rising water" from outside the building. Hermis testified that he found mold in suite 301B behind the base trim and under the floor covering. Hermis discussed evidence of vapor emissions through the slab. He relied on Terracon's engineering study, which included Terracon's floor slab and mechanical assessment of the Property. According to Hermis, Terracon's report indicated "high vapor transmission through the slab" of the Property, which "can cause the vinyl flooring to delaminate," and "can cause mold to grow underneath the floor[.]" Hermis acknowledged the water heater rupture in suite 301A, roof leaks, an air conditioner leak, and some other isolated leaks. Hermis attributed the mold damage in suite 301A to various sources of moisture, including "flooding conditions from the outside."

■ Considering Celtic's admission at trial that it was responsible for any structural problems with the Property and the testimony by Hermis that some of the mold damage was attributable to such issues, we find more than a scintilla of evidence to support the submission of Celtic's contributory negligence to the jury.[7] We sustain issue six. Because we sustain issue six, we need not address issue seven.

7. While Celtic submitted this as a general negligence issue we recognize that a tenant's breach of the duty to exercise reasonable care to protect the leased premises from injury other than normal wear and tear is in essence a breach of the duty to prevent negligent waste. See *King's Court Racquetball v. Dawkins*, 62 S.W.3d 229, 233 (Tex.App.-Amarillo 2001, no pet.); *Sullivan v. Booker*, 877 S.W.2d 370, 372 (Tex.App.-Houston [1st Dist.] 1994, writ denied). In fact, Celtic cited *Dawkins* in its brief in support of its motion to enter judgment, for its contention that the defendants' negligence was properly submitted to the jury. We note that appellants argued in their motion for new trial that allowing plaintiff to recover under both contract and tort theories of liability was improper. However, appellants do not properly raise or pursue this issue on appeal. Although the propriety of allowing recovery under both contract and tort theories of liability is questionable, we refrain from addressing the merits of that issue in this opinion.

## ISSUES EIGHT AND NINE

Issues eight and nine concern Celtic's claim of tortious interference with an existing contract. In issue eight, appellants argue that the trial court erred in denying CHS and CHS/CHS's ("CHS") motion for directed verdict on Celtic's claim of tortious interference with an existing contract. In issue nine, appellants argue that the trial court erred by failing to submit CHS's proposed jury question on its affirmative defense of justification/privilege.

At the close of Celtics case, CHS moved for a directed verdict on Celtics claim for tortious interference with an existing contract. In its motion for directed verdict, CHS argued that there was no evidence of any act of interference by CHS. CHS also argued, in the alternative, that it had conclusively established that it was the parent company of CRMC and as such, it was privileged and justified to interfere with CRMCs contracts; that a parent company cannot tortiously interfere with the contracts of its subsidiaries. The trial court declined to grant CHS's motion.[8]

In reviewing the trial courts denial of CHSs motion for directed verdict we are limited to the specific grounds stated in the motion. *Cooper v. Lyon Fin. Servs., Inc.,* 65 S.W.3d 197, 207 (Tex.App.-Houston [14th Dist.] 2001, no pet.). "An appeal from the denial of a motion for directed verdict is ... a challenge to the legal sufficiency of the evidence." *Haynes & Boone, L.L.P. v. Chason,* 81 S.W.3d 307, 309 (Tex.App.-Tyler 2001, pet. denied). "[A] directed verdict is proper only if the evidence conclusively establishes the movants right to judgment, negates the opponent's right to judgment, or is insufficient to raise a fact issue on a vital fact." *In re Estate of Longron,* 211 S.W.3d 434, 438 (Tex.App.-Beaumont 2006, pet. denied) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex. 2000)).

Generally, " 'a [defendant] must be a stranger to a contract to tortiously interfere with it.' " *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 761 (Tex. 2006) (quoting *Morgan Stanley & Co., Inc. v. Tex. Oil Co.,* 958 S.W.2d 178, 179 (Tex. 1997)); *see also Holloway v. Skinner,* 898 S.W.2d 793, 794–95 (Tex.1995). " '[A defendant] cannot tortiously interfere with its own contract.' " *Vesta Ins. Group,* 192 S.W.3d at 761 (quoting *Holloway,* 898 S.W.2d at 796). Additionally, the Texas Supreme Court has held that there can be no tortious interference when there is a complete identity of interests between a party to a contract and the defendant who is accused of interfering with the contract. *Holloway,* 898 S.W.2d at 795, 797; *see also Grizzle v. Tex. Commerce Bank, N.A.,* 38 S.W.3d 265, 286 (Tex.App.-Dallas 2001), *rev'd in part on other grounds,* 96 S.W.3d 240 (Tex.2002).

Some Texas courts have held that by nature a parent company has a complete identity of financial interest with its wholly owned subsidiary and, therefore, as a matter of law cannot tortiously interfere with the contract of its wholly owned subsidiary. *See Grizzle,* 38 S.W.3d at 286 (citing *Holloway,* 898 S.W.2d at 795–96; *Deauville Corp. v. Federated Dep't Stores, Inc.,*

---

8. The trial court declined to rule on this motion at the close of plaintiffs case, but decided to carry the motion until the charge conference, noting that Celtic may not get an issue submitted on this issue. However, at the charge conference, CRMC and CHS objected to the submission of this jury question only on the grounds that there was no evidence of an affirmative act of interference. CRMC and CHS then asked the court to submit its proposed jury question on intentional interference, which included an instruction related to the act of interfering with the agreement. The trial court denied this request.

756 F.2d 1183, 1196–97 (5th Cir.1985)); *see also H.S.M. Acquisitions, Inc. v. West,* 917 S.W.2d 872, 882–83 (Tex.App.-Corpus Christi 1996, writ denied); *Am. Med. Intl., Inc. v. Giurintano,* 821 S.W.2d 331, 336 (Tex.App.-Houston [14th Dist.] 1991, no writ) (op. on reh'g).[9] Applying Texas law, the Fifth Circuit in *Deauville* held that a parent and its subsidiary are so closely aligned in business interests as to render them the same entity with respect to a tortious interference claim. *Deauville Corp.,* 756 F.2d at 1196–97. In *Giurintano,* the Fourteenth Court of Appeals noted that the "analysis by the Fifth Circuit [in *Deauville* ] was consistent with the United States Supreme Courts holding [in *Copperweld Corp. v. Independence Tube Corp.*] that 'fully owned subsidiaries are incapable of conspiring with their parent, as a matter of law.' " *Giurintano,* 821 S.W.2d at 336 (citing *Deauville Corp.,* 756 F.2d at 1192); *see also Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In *Copperweld,* the Supreme Court considered the scope of the Sherman AntiTrust Act and not the common law tort of tortious interference. *Copperweld,* 467 U.S. at 771, 104 S.Ct. 2731. However, the Supreme Court analyzed the nature of the relationship between a parent and subsidiary as follows:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses [sic], but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the sub-

sidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests . . .

> [I]n reality a parent and a wholly owned subsidiary *always* have a 'unity of purpose or a common design.' They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parents best interest.

*Id.* at 771–72 (footnote omitted).

The *Giurintano* court was persuaded by the reasoning of the United States Supreme Court and concluded that the holdings in *Deauville* and *Copperweld* controlled in determining whether a parent company could tortiously interfere with the business relationships of its subsidiaries. *Giurintano,* 821 S.W.2d at 336. The court also held that because the pleadings established that the hospital-defendant was a completely owned subsidiary of the parent company, the two by nature were so closely aligned that one could not tortiously interfere with the other. *Id.* at 336–37; *see also H.S.M. Acquisitions, Inc.,* 917 S.W.2d at 882–83 (holding parent-subsidiary relationship prevents a tortious interference claim as a matter of law). Likewise, in *Grizzle,* the court followed the reasoning of *Deauville* and concluded that because the evidence established that the bank was a wholly owned subsidiary of its parent company there was no fact issue regarding whether the parent company and the bank had a complete identity of financial interest, and as a matter of law

---

**9.** The Texas Supreme Court has not yet specifically addressed the issue of whether a parent corporation has a privilege to interfere with the contracts of its subsidiaries. *See Valores Corporativos, S.A. de C.V. v. McLane*

*Co.,* 945 S.W.2d 160, 167–68 (Tex.App.-San Antonio 1997, writ denied) (containing a detailed discussion of other courts' treatment of this issue).

the parent company could not tortiously interfere with the banks trust agreements. *Grizzle*, 38 S.W.3d at 286. We agree with the courts of appeals in Houston, Corpus Christi, and Dallas and conclude that as a matter of law, a parent company cannot tortiously interfere with the contracts of its wholly owned subsidiary. *See id.*

Here the undisputed evidence established that CRMC is a wholly owned subsidiary of CHS and CHS/CHS.[10] Therefore, the trial court should not have submitted the tortious interference claim to the jury.[11] Neither CHS nor CHS/CHS can be held jointly and severally liable for the damages awarded to Celtic for CRMCs breach of the Letter Agreement pursuant to the jury's tortious interference finding. We sustain issue eight. Because we sustain issue eight, we need not address the merits of issue nine.

### ISSUES ELEVEN AND TWELVE

Issues eleven and twelve challenge the trial courts denial of CHSs motion for directed verdict on various claims asserted by Celtic.

### Intentional Invasion of Property Rights

In issue eleven CHS asserts that the trial court erred in denying its motion for directed verdict on Celtic's claim for intentional invasion of property rights. CHS did not move for a directed verdict on this claim at trial. However, because

CHS raised the issue in motion for new trial and motion for JNOV we will address the merits of this argument. *See* TEX. R.APP. P. 33.1; *see also* TEX.R. CIV. P. 279 ("A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict . . .").

In issue eleven CHS asserts that the trial court erred in denying its motion for directed verdict on Celtics claim for intentional invasion of property rights. CHS did not move for a directed verdict on this claim at trial. However, because CHS raised the issue in motion for new trial and motion for JNOV we will address the merits of this argument. *See* TEX.R.APP. P. 33.1; *see also* TEX.R. CIV. P. 279 (A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict . . .).

As set forth above, a JNOV is proper when there is no evidence to support an issue or the evidence establishes an issue as a matter of law. *See B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.-Houston [1st Dist.] 2009, pet. denied). In its petition, Celtic alleged that CHS and CRMC's intentional acts were without just cause and resulted in suite 301B "not currently being usable for its intended purpose[ ] as a medical facility." Specifically, Celtic alleged that appellants removed sheetrock and finishes that were not dam-

---

10. The parties did not distinguish between the entities at trial. None of the witnesses provide details as to the structural relationship between the two companies. Jude Torchia, CEO of CRMC, testified that CRMC was a wholly owned subsidiary of CHS and CHS/CHS. This testimony was undisputed.

11. We note that appellants submitted their own proposed jury question on Celtics tortious interference claim, to be used instead of the jury question submitted by Celtic. How-

ever, this question was submitted only after the trial court declined to grant appellants motion for directed verdict on this claim. Additionally, appellants also submitted a jury question on CHS justification/privilege to interfere with the Letter Agreement, which the trial court denied. Under these circumstances, CHS did not waive its claim that the trial court erred in denying its motion for directed verdict on Celtics tortious interference claim.

aged, and that appellants left suite 301B exposed to the elements creating the potential for additional damages. Celtic further alleged that no toxic mold was found or identified in suite 301B to justify any remediation and that appellants' acts proximately caused harm to suite 301B.

"Texas law is well settled that '[a]ny intentional invasion of, or interference with, property, property rights, personal rights or personal liberties causing injury without just cause or excuse is an actionable tort.'" *Suprise v. DeKock*, 84 S.W.3d 378, 380 (Tex.App.-Corpus Christi 2002, no pet.) (quoting *King v. Acker*, 725 S.W.2d 750, 754 (Tex.App.-Houston [1st Dist.] 1987, no writ)). Under this general rule, Texas courts have recognized a cause of action for tortious interference with the peaceful use and enjoyment of property rights, which is, "in essence, a claim for intentional invasion of, or interference with, property rights." *See id.* at 382; *see also Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 21 (Tex.App.-El Paso 2005, pet. denied). The charge instructed the jury that "[t]o establish an intentional interference, Celtic must prove that an invasion or interference with their property rights occurred, that such invasion/interference caused it damage and that such invasion/interference was without just cause nor was otherwise excused." The jury charge provided the following instruction on intentional interference: "[i]nterference is intentional if committed with the desire to interfere with property rights or with the belief that interference is substantially certain to result." The jury found that CHS and CRMC intentionally interfered with Celtic's property rights in suite 301B.

CRMC's CFO, Brian Vaughn, testified that CRMC had a mold assessment done in suite 301B at "the end of 2006, first of 2007." According to Vaughn, Dr. Spooner moved out of suite 301B in April 2007. Vaughn testified that CRMC received the capital expenditure request for the remediation of suite 301B in May 2007 and began the remediation process thereafter. CRMC retained Terracon, which issued a mold remediation protocol in suites 301A and 301B in June 2007, and CST, Environmental Inc., which issued a mold remediation work plan later that month. Celtic presented evidence at trial that appellants undertook the remediation project of suite 301B without notice to Celtic. Dr. Murphy testified that he learned of the ongoing remediation project in July 2007 when he returned to Cleveland. According to Murphy, the carpet had been pulled out, ceiling tiles had been removed, sheetrock had been cut up to 4 ½ feet all around the exterior and interior of the suite, and the suite was "not of any use to function as a medical clinic in the near future."

Appellants stopped the renovation of suite 301B prior to completion around August 2007, three or four months prior to trial. Significantly, however, at the time of trial CRMC was still a tenant of suite 301B and was still paying rent on the leased premises. Vaughn explained that appellants spent $183,000 on mold remediation and stopped renovation in suite 301B in connection with the litigation because their expert told them that there were other probable causes of the mold damage.

The evidence established that Terracon performed testing around July 5, 2007 for suite 301A and on July 11, 2007 for suite 301B, and then issued a certificate of mold damage remediation for both suites on July 13, 2007. Celtic's expert testified that in July 2007, (after Terracon's mold remediation clearance) he still found mold present in suite 301B. Bridge attributed the mold he found in suite 301B to several different moisture sources, including windblown rain through an exterior door,

plumbing leaks, and a water heater plumbing leak.

There is no evidence that appellants undertook or stopped the renovation project without just cause. In addition, the evidence established that CRMC routinely made suite renovations to accommodate doctors who periodically subleased the Property. Although the renovation project in suite 301B was incomplete at the time of trial, CRMC was still a tenant of suite 301B and was still paying rent on the leased premises. The jury awarded full rental value to Celtic for the Property as a medical facility through the date of trial. Further, the evidence established that appellants halted the remediation/renovation project prior to completion in connection with the pending litigation.

On the record before us, we find insufficient evidence to warrant submission of the intentional invasion of property rights issue to the jury. We sustain issue eleven. Because we sustain both issues relevant to the jury's joint enterprise finding, we need not address issue ten.

### Issue Twelve

■ In issue twelve, appellants argue that the trial court erred in denying CHS/CHSs motion for directed verdict on Celtics negligence claim. The jury returned a verdict in favor of Celtic and against all defendants on its negligence issue. In their motion for directed verdict, appellants argued that CHS/CHS owed no legal duty to Celtic and, therefore, there was no basis for a negligence finding against CHS/CHS.[12] The trial court denied the motion.

In order to be held liable for negligence, a defendant must owe the plaintiff a legal duty. *Kroger Co. v. Elwood,* 197 S.W.3d 793, 794 (Tex.2006), *Reeder v. Daniel,* 61 S.W.3d 359, 364 (Tex.2001). Whether a duty exists is a question of law for the court to decide from the particular facts of the case. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990); *see also Entex, A Div. of Noram Energy Corp. v. Gonzalez,* 94 S.W.3d 1, 4 (Tex. App.-Houston [14th Dist.] 2002, pet. denied) (citing *Thapar v. Zezulka,* 994 S.W.2d 635, 637 (Tex.1999)). "In making that determination, we balance the risk, foreseeability and likelihood of injury, against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant." *Williams v. United Pentecostal Church Int'l.,* 115 S.W.3d 612, 615 (Tex. App.-Beaumont 2003, no pet.).

■ As a general rule, a parent corporation is not liable for the torts of its subsidiaries. *See Lucas v. Tex. Indus., Inc.,* 696 S.W.2d 372, 374 (Tex.1984); *see also Abdel–Fattah v. PepsiCo, Inc.,* 948 S.W.2d 381, 383–84 (Tex.App.-Houston [14th Dist.] 1997, no writ). On appeal, Celtic argues that CHS/CHS "assumed a duty with respect to the premises through their exercise of management, control and oversight of the premises." Celtic cites *Seay v. Travelers Indem. Co.,* 730 S.W.2d 774, 777–78 (Tex.App.-Dallas 1987, no writ) in support of its contention that CHS/CHS assumed a duty in this case. In *Seay,* the court recognized a legal duty flowing from an insurance company to the employees of its insured where the insurance company had voluntarily conducted an inspection of its insured's water boilers. *See id.* at 777.

---

**12.** It appears from the record that the trial court granted summary judgment in favor of CHS as to Celtics negligence claim. Because the final judgment contains no affirmative finding against CHS on Celtics negligence claim, it is not part of this appeal. Appellants concede the same.

The Court applied section 324A of the Restatement (Second) of Torts. *Id.* at 778. Section 324A provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm; or
>
> (b) he has undertaken to perform a duty owed by the other to the third person; or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS, § 324A (1965). The Court in *Seay* held that the plaintiff raised issues of fact regarding the insurer's breach of duty, which precluded summary judgment. *Seay,* 730 S.W.2d at 780–81.

Celtic argues that "liability for CHS/CHS accrued here when it undertook to perform services for CRMC and which undertakings created a duty to the third party[.]" However, Celtic does not point us to any "services" that CHS/CHS undertook to perform for CRMC with respect to the maintenance or repair of the Property. No evidence was presented of any activity or affirmative undertaking by CHS/CHS that could give rise to liability under a negligent undertaking theory pursuant to section 324A. Celtic presented evidence that CHS/CHS issued a manual that established a code of conduct applicable to CRMC and its employees, which contained the following provisions:

*Health, Safety, and the Environment*

█ CHS is committed to providing a safe and healthy workplace for all colleagues, customers, patients, and visitors. CHS is equally committed to minimizing any negative impact upon the environment. These commitments can be achieved through the awareness and cooperation of all colleagues.

Each colleague is responsible for abiding by safe operating procedures, guarding his/her own health along with his/her coworkers, utilizing pollution control systems, and following safe and sanitary procedures for the disposition of industrial and hazardous waste materials.

Colleagues are encouraged to report to a supervisor, department head, the Facility Compliance Chairperson, the Corporate Compliance Officer, or the Confidential Disclosure Program any condition they perceive to be unsafe, unhealthy, or hazardous to the environment.

On appeal, Celtic emphasizes the fact that the appellate court in *Seay* reviewed a manual drafted, printed, and issued by the insurer for its authorized inspectors, which required that code violations be brought to the attention of its insured when discovered. First, CHS/CHS's code of conduct merely "encourages" hospital employees to report unsafe and unhealthy conditions. Second, in *Seay* the manual's directive was not asserted as the source of the insurer's duty, but rather as evidence of the purpose behind insurer's undertaking of the inspections, specifically, whether the insurer undertook to render services (the inspections) for another (the insured/decedent's employer) or for itself (to evaluate the boilers as insurable risks). *Seay,* 730 S.W.2d at 778–79. A company's internal policies or procedures will not create a negligence duty where none otherwise exists. *Gonzalez,* 94 S.W.3d at 10; *see also Jacobs–Cathey Co. v. Cockrum,* 947 S.W.2d

288, 291–92 (Tex.App.-Waco 1997, writ denied) (holding that company's internal policy of removing debris left at its work sites by other parties did not impose upon the company a legal duty to parties injured by unremoved debris); *Estate of Catlin v. Gen. Motors Corp.*, 936 S.W.2d 447, 451 (Tex.App.-Houston [14th Dist.] 1996, no writ) (holding that company's safety policies restricting consumption of alcohol on its premises did not create legal duty that would subject the company to liability for failing to comply with those policies); *cf. Owens v. Comerica Bank*, 229 S.W.3d 544, 547 (Tex.App.-Dallas 2007, no pet.) ("The Texas Supreme Court has refused to create a standard of care or duty based upon internal policies, and the failure to follow such policies does not give rise to a cause of action in favor of customers or others.") (citing *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92 (Tex.2004)).

 There is no evidence that CHS/CHS was involved in the day-to-day operational activities of CRMC. It is undisputed that CRMC was responsible for the day-to-day maintenance and repairs of the Property and that CHS/CHS [13] merely approved certain requests for capital expenditures. A parent company's control of "such remote conduct as budgeting activities" is insufficient to impose liability under a control-based negligence theory for injuries arising out of the day-to-day operational activities of a subsidiary. *Coastal Corp. v. Torres*, 133 S.W.3d 776, 779 (Tex. App.-Corpus Christi 2004, pet. denied). We find the trial court erred in denying CHS/CHS's motion for directed verdict and rendering judgment on the jury's finding of negligence against CHS/CHS. We sustain issue twelve.

13. The testimony at trial makes no distinction between the functions of CHS and CHS/CHS with respect to the Hospital.

## ISSUE THIRTEEN

 In issue thirteen, appellants argue that the trial court erred in granting a directed verdict in favor of Celtic on CRMCs claim for breach of the warranty of suitability. Upon the close of the defendants case, Celtic moved for a directed verdict on CRMCs claim for breach of the warranty of suitability. The basis of the motion was Celtics statute of limitations defense. The trial court granted Celtics motion for directed verdict. A party moving for directed verdict on limitations must conclusively establish the date on which the cause of action accrued and the date that suit was filed. *Conquest Drilling Fluids, Inc. v. Tri–Flo Int'l, Inc.*, 137 S.W.3d 299, 302 (Tex.App.-Beaumont 2004, no pet.); *see also KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). In reviewing the trial courts grant of a motion for directed verdict, we must consider all the evidence in the light most favorable to the party against whom the verdict was directed, disregarding all contrary evidence and inferences. *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex.1996). We must determine if there is any probative evidence to raise a fact issue on the claim. *Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex.1986).

 The implied warranty of suitability applies to landlords in a commercial lease. *Davidow v. Inwood N. Prof'l Group–Phase I*, 747 S.W.2d 373, 377 (Tex. 1988). The Court explained the warranty as follows:

[T]here is an implied warranty of suitability by the landlord in a commercial lease that the premises are suitable for their intended commercial purpose. This warranty means that at the incep-

tion of the lease there are no latent defects in the facilities that are vital to the use of the premises for their intended commercial purpose and that these essential facilities will remain in a suitable condition. *Id.* The Court in *Davidow* recognized that if the parties to a lease expressly agree that the tenant will repair certain defects, the lease provisions control. *Id.*

 "Actions for breach of express or implied warranties are also governed by the four-year statute of limitations and the discovery rule." *El Paso Assocs., Ltd. v. J.R. Thurman & Co.,* 786 S.W.2d 17, 20–21 (Tex.App.-El Paso 1990, no pet.); *see also Goose Creek Consol. Indep. Sch. Dist. v. Jarrars Plumbing, Inc.,* 74 S.W.3d 486, 493 (Tex.App.-Texarkana 2002, pet. denied) (citing Tex. Civ. Prac. & Rem.Code Ann. § 16.004 (Vernon Supp. 2002)); *Conann Constructors, Inc. v. Muller,* 618 S.W.2d 564, 566 (Tex.Civ.App.-Austin 1981, writ ref'd n.r.e.) (recognizing that a warranty which the law implies from a written agreement is governed by the limitations statute pertaining to written contracts). CRMC filed its counterclaim against Celtic asserting breach of warranty of suitability in August 2007.

When Celtic moved for its directed verdict on this issue, it argued there was extensive testimony at trial dating the permeation and water intrusion issues as far back as 1996. CRMCs expert, Henry Hermis, testified that the mold damage was caused by various water intrusions and moisture, including but not limited to intrusions resulting from rising water out-

side the building, roof leaks, and some other isolated water leaks. Hermis testified that he was aware of invoices from as early as 1996 indicating that water had been extracted from suites 301A and 301B. Hermis also relied on the testimony of Dr. Spooner and James Kelly regarding water intrusions that occurred in 2003 and 2004.

At trial CRMC did not dispute that the water intrusions formed the basis of their claim for breach of warranty of suitability claim, but argued that the mold resulting from those water intrusions was not discovered until 2004. CRMC further argued that it was unaware that the water intrusions had caused the mold until they hired Terracon to evaluate and offer an opinion on the cause of the mold damage, in 2007. CRMC did not plead the discovery rule in response to Celtics asserted statute of limitations defense. *See Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517–18 (Tex.1988); *see also* Tex.R. Civ. P. 94. Therefore, the discovery rule does not apply. *See id.* Even if the discovery rule applied, the evidence established that CRMC knew, or with reasonable diligence should have known, of the facts giving rise to their claim more than four years prior to the filing of their claim in August of 2007.

CRMC argues its expert identified two primary latent defects in the leased premises with respect to the condition of the slab and its elevation, which contributed to the water intrusions into the building.[14] CRMC leased the Property from Celtic in 1994. The evidence at trial established

14. CRMC's expert testified to the latent defects as following:

Well, the two things that I would consider to be latent defects, one would be that having—dealing with the slab, the condition of the slab.

We have the vapor transmission through the slab that I don't think anybody ex-

pected at that level to be under the vinyl flooring and the other thing is that the elevation of that slab is set such that water has flooded into that building and I guess you could consider that a latent defect.

that water intrusions occurred on the leased premises as early as 1996. At trial, Celtic admitted a letter from Mrs. Murphy to CRMC dated January of 1996 indicating various concerns with the building, including water intrusions. The letter states in pertinent part that "[roof] ... leaks are a serious concern" and that there are "[d]rainage problems to the back—heavy rains and the water is forced to flow into the building." In addition, James Kelly an employee of CRMC, testified at trial regarding numerous incidents of water intrusions, which had occurred over the years, including significant flooding incidents that he testified occurred while Dr. Stanus occupied suite 301B and then later in 2003 when Dr. Spooner moved into suite 301B. Further, Dr. Murphy admitted during cross-examination that there were water intrusions in suites 301A and 301B in 2000.

■■■■ "As a general rule a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex.2003). Generally, limitations begin to run when the wrongful act causes legal injury, regardless of when the plaintiff learns the extent of the injuries. *Id.* CRMC's argument that breach of the implied warranty claim did not accrue until CRMC discovered the actual mold damage in 2004, or until they hired an expert to determine the cause of the mold damage is unpersuasive. *See Polk Terrace, Inc. v. Curtis,* 422 S.W.2d 603, 605 (Tex.Civ.App.-Dallas 1967, writ ref'd n.r.e.) (holding that suit filed immediately after expert evaluation, but over five years after defects were first noticed in the house, was barred by limitations); *see also Richker v. United Gas Corp.,* 436 S.W.2d 215, 219 (Tex.Civ. App.-Houston [1st Dist.] 1968, writ ref'd n.r.e.) (holding suit barred by limitations

where buyer knew that machinery purchased was defective and had suffered injury more than two years prior to filing suit even though cause of machinery's failure to perform was unknown at that time); *Smith v. Gray,* 882 S.W.2d 103, 105–06 (Tex.App.-Amarillo 1994), *writ denied per curiam,* 907 S.W.2d 444 (Tex.1995) (noting that limitations began to run when plaintiffs discovered the nature of their injury and not the cause of the injury). Because the evidence establishes that CRMC was injured as a result of the alleged breach of warranty as early as 1996 and the alleged water intrusions continued up through 2003, we conclude limitations on CRMC's breach of warranty claim expired prior to CRMC's filing of that claim in August 2007. We overrule issue thirteen.

We reverse the portions of the judgment finding defendants liable for tortious interference with an existing contract and intentional invasion of property rights and render judgment that plaintiff take nothing on those causes of action. We reverse the portion of the judgment finding defendants liable for negligence and awarding damages for negligence and remand to the trial court for a new trial. We affirm the judgment in all other respects.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.

DAVID GAULTNEY, Justice, dissenting.

This is a contract dispute over the validity of a lease, the amount owed under a lease, and the payment for the repairs to the building. *See Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991) ("When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract."). The parties agreed that, when one of the subtenants vacated a specific portion of the

property, the Master Lease would no longer be in effect, and the parties would "enter into a new Master Lease." Despite this agreement, they did not "enter into a new Master Lease." CRMC, the tenant, continued to pay the same amount, and Celtic, the landlord, accepted the same payments. At trial, Karen Murphy, who attended certain meetings of Celtic and hospital administrators, acknowledged her handwriting on the letter agreement next to the termination-of-lease provision: "This did not happen as we thought and the Master lease and sublease were renewed."

Celtic claims in this lawsuit that it is entitled to the amount the parties agreed would be paid if the parties had entered into a "new Master Lease." This claim is without basis. The letter agreement on which plaintiff sued provides that Celtic would have "at leas[t] sixty (60) days, from the date the vacation starts, to obtain financing and to enter into a new Master Lease...." If the parties intended the letter agreement itself to be the new lease, the letter agreement would not have expressly provided that the parties would "enter into a new Master Lease."

Celtic's lawyer claimed in 2005 that CRMC was a hold-over tenant. CRMC's in-house counsel responded by email (Exhibit 68) that the Master Lease automatically renewed on its own terms, and that the lease was "fully current, in full force and effect and there is no holdover occurring." Celtic's lawyer then agreed with CRMC's analysis, as established by the attorney's email. "Ratification occurs when a party recognizes the validity of a contract by acting under it, performing under it, or affirmatively acknowledging it." *Zieben v. Platt*, 786 S.W.2d 797, 802 (Tex.App.-Houston [14th Dist.] 1990, no writ). Celtic continued to accept payments as provided under the ratified Mas-

ter Lease. Celtic should not now be able to recover increases in lease payments it wishes it had been able to obtain under a "new Master Lease" that the parties never "enter[ed] into."

The record reflects that Celtic objected during the trial to the admission of Exhibit 68 (containing the referenced email), and the trial court sustained the objection and rejected CRMC's offer of proof.

> The Court: Your objection is sustained.
> [CRMC's Counsel]: Just for the record our offer of proof is denied?
> The Court: Yes.

The majority opinion indicates the email was admitted during a pre-trial hearing. Yet in this appeal, CRMC argues the email was improperly excluded, and Celtic argues the evidence was properly excluded. The parties do not dispute that the trial court excluded this email evidence when it was actually offered into evidence during the trial itself.

The offer of proof was not solely as to attorney's fees. CRMC also offered the email as an admission concerning the issue of ratification. CRMC's counsel summarized the offer: "We would like to make an offer of proof both in connection with the opinion about attorney's fees and also as an admission of a party opponent which goes directly to our affirmative defense of ratification."

The trial court erred in refusing to admit the attorney's email during the trial. The email seems conclusive on the issue of ratification, but if not, the email was at least an admission by an agent authorized to speak for the landlord. *See* TEX.R. EVID. 801(e)(2)(C). Given the dispositive nature of the evidence, the evidentiary ruling by the trial court was harmful error. *See* TEX.R.APP. P. 44.1.

The parties also dispute who is responsible for the repair costs. The parties' con-

tract, not tort law, governs the repair dispute. *See DeLanney,* 809 S.W.2d at 494–95. Paragraph 6 of the contract states what the tenant is responsible for and what the landlord must repair and replace. Paragraph 12 deals with damage caused by "Casualty." The sublease agreements also contain repair provisions.

The trial court's errors reflect an unfair trial and "probably caused the rendition of an improper judgment." Tex.R.App. P. 44.1. We should reverse the judgment in its entirety and remand the case for a new trial on the contract claim. Because the majority opinion affirms in part the erroneous judgment, and reverses and remands in part for a re-trial on an inapplicable tort theory of recovery, I respectfully dissent.