**Opinion issued May 1, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00501-CV

———————————

**LIPPERT COMPONENTS, INC., Appellant**

**V.**

**QUINTON WILLIAMS, Appellee**

---

**On Appeal from the 40th District Court**
**Ellis County,[1] Texas**
**Trial Court Case No. 97958**

---

[1]     The Texas Supreme Court transferred this appeal from the Court of Appeals for the Tenth District of Texas. See TEX. GOV'T CODE ANN. § 73.001 (authorizing transfer of cases between courts of appeals). Under the Texas Rules of Appellate Procedure, "the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court." TEX. R. APP. P. 41.3. The parties have not cited, nor has our research revealed, any conflict between the precedent of the Tenth Court of Appeals and that of this court on any relevant issue.

# OPINION

Appellant, Quinton Williams, was injured while working at Kinro Texas, Inc.'s (Kinro) facility in Waxahachie, Texas. Williams sued numerous entities, including Kinro and Kinro's parent corporation, appellee Lippert Components, Inc. (Lippert), asserting various negligence-based causes of action, premises liability, and products liability. Trial proceeded against Kinro and Lippert. Following jury selection, Williams nonsuited his claims against Kinro pursuant to the parties' Rule 11 agreement and tried the case against Lippert on negligence and negligent undertaking claims.

The jury found both Williams and Lippert negligent, and it apportioned 5% responsibility to Williams and 95% responsibility to Lippert. The jury awarded Williams $1,599,684.41 in total damages, including $87,600.00 for past pain and suffering, $613,200.00 for future pain and suffering, $87,600.00 for past physical impairment, $613,200.00 for future physical impairment, and $198,084.41 in future medical care expenses. The trial court rendered judgment on the jury's verdict, taking into account Williams's 5% contributory negligence.

In five issues, Lippert contends that (1) the trial court erred in submitting general negligence and negligent undertaking claims to the jury; (2) Williams's claims are barred by the exclusive remedy of the Texas Workers' Compensation

Act;[2] (3) the evidence was legally and factually insufficient to support the jury's award of future medical expenses; (4) the trial court erred in denying Lippert's motion to designate Kinro as a responsible third party and refusing to submit Kinro's proportionate responsibility to the jury; and (5) the trial court erred in refusing to submit jury questions and instructions on the application of the exclusive remedy defense and whether Lippert exercised control over specific safety aspects that led to Williams's injury.

We reverse and render.

## Background

### A.    Parties Overview

In 2015, Williams was employed by Diversified Sourcing Solutions (Diversified), a temporary staffing company.  He was assigned as a temporary worker to Kinro's facility in Waxahachie, Texas.  Kinro is a subsidiary of Lippert.  Lippert manufactures component parts used in industries such as manufactured housing, recreational vehicles, and automotive.  In 2010 or 2011, Kinro transferred the assembly line and equipment from its Georgia facility to its facility in Waxahachie.

Williams's injury occurred on August 28, 2015.  Williams was unloading glass sheets from an "L-cart."  When some of the sheets began to fall, Williams

---

[2]    *See* TEX. LABOR CODE ANN. § 411.004.

reached out to try to stop them. One of the sheets broke and cut his arm, severing two arteries, nerves, tendons, and ligaments. He was flown by helicopter to Baylor University Medical Center in Dallas where he underwent emergency surgery to repair the severed arteries.

## B.    Pleadings and Pretrial Proceedings

In 2017, Williams sued Lippert and Kinro, among other defendants, in Travis County, Texas. Kinro moved to transfer venue to Ellis County, Texas, which the trial court granted.[3]

Williams's Fifth Amended Petition was the live pleading at the time of trial. Relevant here, Williams alleged:

> Defendant LIPPERT COMPONENTS undertook responsibility for safety at the Facility. In doing so, LIPPERT COMPONENTS knew or should have known these services were necessary for PLAINTIFF'S safety. LIPPERT COMPONENTS failed to exercise reasonable care in performing those services increasing PLAINTIFF'S risk of harm. In particular, LIPPERT COMPONENTS was negligent in the following respects:
>
> 1. In failing to inspect the premises for dangerous conditions and/or hazards located on the premises;
>
> 2. In failing to remedy the dangerous condition and/or hazard that it knew of, or in the exercise of ordinary care, should have known was present on its premises;
>
> 3. In failing to warn of the dangerous condition and/or hazard located on said premises;

---

[3]    Lippert filed a special appearance after the case was transferred. Lippert did not set its special appearance for hearing but never withdrew it.

4. In failing to equip the cart made the basis for suit with brakes and/or other safety devices; and

5. In more particularity to be shown at trial.

Each and all of the above and foregoing acts on the part of . . . LIPPERT COMPONENTS . . . constituted negligence and were each and all a proximate cause of the occurrence in question and the injuries and damages suffered by PLAINTIFF.

## C.    Trial

Lippert and Kinro were the only remaining defendants at the start of trial and were represented by the same trial counsel.  Trial began in May 2021 and lasted five days.

Following jury selection, Lippert's counsel asked Williams to nonsuit Kinro, and Williams agreed as part of a negotiated agreement.  The parties' Rule 11 agreement filed on May 24, 2021 states:

- Plaintiff will dismiss Kinro Texas, Inc. with prejudice;

- Lippert Components, Inc. stipulates that it will not argue or claim that it was a client of Diversified

- Plaintiff stipulates that Lippert Components, Inc. had a valid workers' compensation policy at the time of Plaintiff's accident

- Nothing in this agreement precludes either Kinro Texas, Inc. or Lippert Components, Inc. from pursuing in a separate action any claims for defense or indemnification against Diversified

Williams abandoned his products liability and premises liability claims against Lippert during trial.

5

### 1. Kashena Williams

Kashena, Williams's wife, testified that Williams was not the same after his accident. He once enjoyed playing football, basketball, and baseball, but since the accident, he no longer plays sports or video games with his son. She testified that after the accident, Williams was always angry, sad, or nervous, and his depression affected their marriage. Kashena testified that Williams is unable to do some of the chores he previously did such as bringing in groceries, mowing the yard, and washing the cars. Williams underwent physical therapy and rehabilitation after the accident and eventually began a new job. Williams still comes home from work in pain every day.

### 2. Hector Monreal

Monreal was hired by Kinro Composites as a safety administrator in 1999. His job duties later expanded to include human resources and payroll.

Monreal began working for Lippert in 2010 or 2011. He testified that "Lippert had safety corporate people that were EHS, Environmental, Health and Safety that would visit" the Waxahachie facility and "different safety coordinators from Lippert contact[ed] him for different occasions."

Monreal testified that Williams had only been assigned to the Waxahachie facility a few weeks prior to the accident. He stated that a new worker such as Williams received personal protective equipment (PPE) and on-the-job training by

one of the line workers or supervisors of the department to which he was assigned. Monreal did not provide any safety training to Williams, and he did not witness the accident that injured Williams. Based on information he received from Williams's supervisor, Mariano Salazar, and witness interviews he conducted, including an interview with Williams, Monreal submitted an accident report. The report identified the two causes of the accident as Williams's failure to wear PPE and the fact that the L-cart he was using at the time of the accident did not have brakes. Monreal stated that he was not responsible for inspecting equipment at the Waxahachie facility or determining whether it was safe. He agreed that the job of handling the glass plates could be dangerous, and that it was possible that the L-cart would not have rolled if it had been equipped with brakes.

Monreal testified that safety manuals were posted and that it was possible that new employees were advised where to find them if they needed them. He testified that Kinro employees at the Waxahachie facility supervised Williams's day-to-day duties and scheduled his hours. Williams was responsible for wearing his PPE which was made available to all employees. When asked who he believed was operating the Waxahachie facility in 2015, Monreal answered Lippert.

### 3. Dr. Jennifer Chu

Dr. Chu is an orthopedic surgeon who operated on Williams following the accident. She testified that he sustained lacerations to his forearm which severed the

7

ulnar and radial arteries. Williams underwent emergency vascular surgery to stop the bleeding and repair the damaged blood vessels to prevent the loss of his arm. Dr. Chu performed two surgeries: the first involved opening his wounds to determine the extent of the damage and repair the multiple lacerated tendons, muscles, and nerves, and the second was to ensure the nerve repair was intact and to remove scar tissue from the tendons.

Dr. Chu remained Williams's primary orthopedic surgeon for the next couple of years. Dr. Chu testified that she prescribed several pain medications for Williams, including hydrocodone and gabapentin for neuropathic pain, and physical therapy. She stated that Williams sustained permanent loss of hand function and began seeing a psychologist to address the emotional impact from the loss. Dr. Chu testified that she did not believe Williams could return to a manual labor job due to the injuries to his right hand and arm. After nearly a year off work, Williams was released to return to work with a permanent restriction.

### 4.    Dr. Jason Marchetti

Dr. Marchetti is a board-certified life care planner whom Williams designated as an expert witness.[4] He described life care planning as the process of identifying the reasonable medical goods and services an individual who has been injured would

---

[4]    Dr. Marchetti is also board certified in physical medicine rehabilitation and interventional regenerative orthopedic medicine.

likely require over the course of his lifetime. He testified that a life care plan is a guide for future treatment and not a prescription of care. According to Dr. Marchetti, life care planning has four goals: (1) minimize pain and suffering, (2) reduce the chance of complications, (3) increase the ability to function and quality of life, and (4) determine the cost of medical good and services.

To prepare a life care plan for Williams, Dr. Marchetti reviewed relevant documents, including Williams's medical records, and evaluated Williams in September 2019. He then formulated the diagnoses associated with Williams's injuries and determined the likely duration of his care. Because Williams sustained a permanent injury, Dr. Marchetti estimated his life expectancy to determine which future medical goods and services would be reasonable to accomplish the plan's four goals.

Based on his evaluation of Williams and medical record review, Dr. Marchetti identified five diagnostic conditions: (1) lacerations to the forearm with vascular injuries, (2) complete median nerve laceration, (3) a finding of residual sensory deficit resulting in hypersensitivity, weakness, and pain, (4) extensive contractures (bending) and stiffening of the fingers limiting flexion, and (5) reactive depression with mixed anxiety and depression as a result of the injuries. Dr. Marchetti testified that these conditions impacted Williams's ability to engage socially, such as playing sports and fishing, and his work-related activities both at home and at his job.

9

Using the National Vital Statistics System, Dr. Marchetti determined that the average life expectancy for someone Williams's age was thirty-seven years. He then determined which medical goods and services he believed would benefit Williams, their duration, and how frequently he would need them in the future. Dr. Marchetti prepared a written report, which the trial court admitted into evidence, that identified five categories of future medical care he anticipated Williams would require:

- physician services (e.g., outpatient doctor appointments or procedures);

- routine diagnostics (e.g., imaging studies and nerve conduction testing);

- medication;

- rehabilitation services (e.g., physical and psychological therapy); and

- acute care services (e.g., hospitalization, surgery).

Dr. Marchetti projected that Williams would incur $16,544.57 in "physician service costs,"[5] which was derived from the eightieth percentile of healthcare charges in Williams's geographic location. Dr. Marchetti anticipated that the doctors who would treat Williams in the future would order "routine diagnostic

---

[5] The physician services listed in Dr. Marchetti's report consist of plastic hand surgery, consultation with a plastic hand surgeon, and physical medicine and rehabilitation, with each service beginning at various ages, with varying frequency, and lasting between two and twenty-seven years.

testing"[6] of Williams, for which he projected a total cost of $16,656.03. He anticipated that Williams would require prescription medication to manage his nerve pain and depression in the future. Based on the average price of the medication in Williams's geographical region, he projected $100,109.73 in total medication costs.[7] Dr. Marchetti testified that he anticipated that Williams would need rehabilitation services[8] and projected a total cost of $44,996.96 for those services. Dr. Marchetti anticipated that Williams would undergo surgical procedures to eliminate scar tissue and pain and reduce the likelihood of developing complications in the future, and he projected a total cost of $19,777.12 in acute care services.[9] Dr. Marchetti testified that he anticipated total future medical costs of $198,084.41. He opined that if Williams "doesn't get these things, then obviously he's probably not going to achieve those goals."

---

[6] The routine diagnostic tests listed in the report are EMG nerve conduction testing, MRI scan, and hand and wrist x-rays at varying intervals and with a duration of between one and thirty-seven years.

[7] The prescription medications listed in the report are Lyrica, NSAID: Ibuprofen, and Cymbalta.

[8] The rehabilitative services in the report consist of post-operative occupational therapy, cognitive behavioral therapy, and periodic occupational therapy at differing intervals, with a duration of between one and thirty-five years.

[9] The acute care services listed in the report consist of an operation for "Scar revision: Arm" and an operation for "Extensor contracture release with tenolysis: hand or finger."

On cross-examination, Dr. Marchetti testified that he is not one of Williams's treating physicians. He examined Williams only once in September 2019, when Williams was thirty-seven years old, and he had not evaluated Williams since he submitted his report in January 2020. Dr. Marchetti testified that the last medical treatment that Williams received was in mid-2018.

Williams's life care plan identified thirty-eight years as the age at which it would be reasonable for Williams to receive some of the medical care listed in the plan.[10] He testified that he had not seen any medical records showing that Williams had plastic hand surgery, physical medicine and rehabilitation, or the surgeries listed in the life care plan to date. Dr. Marchetti testified that Lyrica, NSAID Ibuprofen, and Cymbalta were the medications that he "projected as being reasonably probable." Dr. Marchetti was not aware that Williams had testified at his deposition that he had taken Lyrica but did not like taking it due to the side effects, and he did not want to take it again. Dr. Marchetti acknowledged that Lyrica accounted for approximately $95,000.00 of the $198,000.00 in total future medical costs. He testified that Williams was not taking any antidepressants at the time of trial and had

---

[10]    Under the column "Begin at Age," the report lists thirty-eight years of age for the following medical treatment/medication: plastic hand surgery, physical medicine and rehabilitation, EMG/NCS: Upper Extremity, MRI scan, Arm x-ray, Wrist x-ray, Lyrica, NSAID: Ibuprofen, Cymbalta, post-operative occupational therapy and cognitive behavioral therapy, and operations for scar revision and extensor contracture release with tenolysis: hand or finger.

12

not received occupational therapy or cognitive behavioral therapy. Dr. Marchetti was then asked whether Williams was taking any prescribed medications at the time of trial:

> A. Well, again, I should clarify, I don't know what he's doing today. I can just tell you that what he was taking when I saw him was [I]buprofen.

> Q. Right. And that's the point. You don't know what Mr. Williams'[s] medical condition is today, do you, sir?

> A. No, I don't.

On re-direct, Dr. Marchetti testified that the fact that Williams had not received certain treatments or taken the medication listed by Dr. Marchetti did not mean that he did not need them. In his opinion, "it would behoove [Williams] to address [his conditions] sooner rather than [ten] or twenty years from now."

### 5. Quinton Williams

Williams and Kashena had been married more than twenty years and had three children together. Williams attended college but later left when Kashena became pregnant with their first child.

Williams testified that he was previously employed by Diversified as a temporary worker. Diversified assigned Williams to Kinro. When he arrived at the Waxahachie facility, he met Monreal, who gave him paperwork to fill out. Afterwards, his supervisor, Salazar, led him to the production floor. There, Salazar took him to a specific line and told Williams to stand at the end of the line and place

13

completed window frames onto a cart to be ready for shipping. Williams testified that he did not receive any written safety materials or watch any safety videos, and he did not receive any safety or job training while he worked at Kinro. Williams testified that he was given a Kevlar sleeve and told to wear it on the production floor. He was not told how to handle glass or that he should let falling glass drop to the floor.

On August 28, 2015, Williams was at his assigned station on the production floor. He testified that a supervisor approached and told him that he was needed in the vinyl punch department. After an hour or two in that department, the supervisor returned and sent him back to the window frame department. Williams testified that the supervisor and other employees gathered for a brief meeting on the floor. The plant manager informed them that the line lead would not be working with them for the rest of the day, and that an employee from another department would come to occasionally check on them.

Five minutes later, Williams was told that he was needed to pull glass to help fulfill an order. The job entailed taking large pieces of freshly cut glass that were held in place by a dog chain encased in a garden hose on an L-cart and placing them on a flat cart. No one told Williams how to handle the glass or use the L-cart. He estimated that one glass sheet weighed between twenty-five and thirty-five pounds. With the L-cart in front of him and the flat cart to his left, Williams began handling

14

the glass.  As he was placing two or three glass plates down, he turned toward the L-cart and saw the glass falling forward.  Instinctively, he reached out to try and catch the falling glass and called for help to lift the plates off of his arm.  Williams heard someone scream "drop it."  After Williams dropped the glass, he looked down and saw blood squirting profusely from his arm.

Salazar took him to the bathroom where he applied a tourniquet while they waited for emergency medical services.  Williams was taken by Life Flight helicopter to the hospital where he underwent emergency surgery. Williams testified that he had a total of three surgeries.  He continued taking hydrocodone for the pain and went to physical therapy and rehabilitation for more than two years.  Williams testified that he went into a deep depression due to not being able to work, and that it affected his marriage.

Williams testified that he returned to work as soon as he was released to do so.  Although his current job is easier than the one he had at Kinro, he still comes home in pain.  He is no longer able to play sports, fish, or play video games with his son.  He testified that he still experiences pain and has numbness from his middle finger to his thumb.

On cross-examination, Williams testified that Kinro issued him a Kevlar sleeve and that Kinro employees told him which job to do as well as the hours he was required to work. He stated that he should have been wearing the Kevlar sleeve

15

while working with the glass, but he was not wearing it at the time of the accident. He testified that he did not ask any of the employees for instructions on how to do the job moving glass or look to see whether the L-cart he was using had brakes. Williams testified that he had not received any medical treatment or taken any prescription medication, including antidepressants, for his injuries in the previous three years.

### 6. Ricky Seward

In 2015, Seward worked for Lippert as an EHS Senior Manager. He was responsible for multiple Lippert divisions. In his role, Seward visited the Kinro Waxahachie facility and conducted safety audits to help Kinro recognize, evaluate, and eliminate risks. He also made recommendations to Kinro to ensure the facility's compliance.

Seward conducted the initial safety audit at the Waxahachie facility in Spring 2015, before Williams's accident on August 28, 2015, and conducted quarterly safety audits thereafter. He testified that he was in charge of ensuring that Kinro facilities, including the Waxahachie facility, had the proper up-to-date safety policies and procedures in place and that the facility was in compliance. Seward testified that he did not have a role in the day-to-day operations of the Kinro facility, and Kinro employees were responsible for the hiring, firing, supervising, and

16

training at the facility. Monreal was the head of safety at the Waxahachie facility in 2015.

Seward agreed that Lippert instituted certain safety policies and procedures to protect the people who worked in the facilities:

Q:     So they've undertaken the responsibility making sure that each
        of their divisions operates safely, correct?

A:     Correct.

Seward also testified that he reported back to his boss, Erick Click, after every trip to the Waxahachie facility. He stated that Lippert was aware of the status of safety issues at Kinro's Waxahachie facility through his reporting, and if Kinro did not address safety issues, he could influence local management at the facility by going over their head to Click. Further, if there was a serious safety issue he could go to Lippert's Chief Executive Officer, Jason Lippert, to influence local management to correct the issue, but he had never done that to date. Seward testified that, in 2015, the sign outside the Waxahachie facility bore the names Lippert and Kinro.

Seward testified that Lippert's safety manual is provided to all of its divisions. Lippert advised Kinro to make the manual available to every worker, including temporary workers like Williams, at its Waxahachie facility. He testified that Lippert did not confirm whether Kinro had done so, and Lippert did not provide the manual to workers at the Waxahachie facility. Seward testified that a safety video

17

was available for new workers, but he did not know whether Williams was shown the video. He testified that Kinro is supposed to provide new workers with the safety manual and ask that they read it and sign an acknowledgement page, and local management should have reviewed the thirteen topics in the safety manual with Williams. He testified that Williams needed safety training before working with the glass, and Williams's supervisor or a more experienced worker should have provided him with job training. When he visited the Waxahachie facility, Seward asked local management how many new hires they had and to see the signed acknowledgements, but he did not review the acknowledgments to match them to the new hires. He agreed that if Williams did not get safety training and job training, his risk of injury would increase.

Seward testified that he became involved in the investigation of Williams's accident and submitted a report to the Occupational Safety and Health Administration (OSHA). In the report, Seward identified the "root cause" of the accident as the weight of the glass shifting forward causing the L-cart to move backward and away from Williams. According to Seward, a brake, or wheel chock, on the L-cart would have reduced the risk of injury and made the job safer.

On cross-examination, Seward explained that Lippert's safety manual contains guidelines, but Lippert cannot force Kinro to follow them. Kinro management decides how to implement the guidelines and whether to make the

safety manual available to workers.  Seward testified that a failure to give the safety manual to workers or provide job training to them would be a failure on Kinro's part, not Lippert's.  Further, Kinro decided where an employee worked, when to begin work, the length of his shift, the PPE and equipment provided, and the method and manner in which the employee would accomplish his job.  He testified that Kinro employees, not Lippert employees, are in charge of safety at the Waxahachie facility. He stated that Monreal was mistaken when he testified that he worked for Lippert.

### 7. Jill Smith

Smith worked in Kinro's Human Resources department in 2015.  In this role, she handled insurance issues and issued payroll.  She testified that Lippert's name, not Kinro's, appears on employees' paychecks.  Smith testified that a Kinro employee would have supervised Williams and controlled the day-to-day details of his work.

### 8. Russ Elveston

Elveston is a safety engineer whom Williams designated as an expert. Elveston worked for OSHA for thirty years before retiring to start his own safety consulting business.  He reviewed the deposition testimony of Monreal, Salazar, and Seward as well as Lippert's safety manual in formulating his opinions.

According to Elveston, there was no evidence that Williams had received any training before he began working at the Waxahachie facility.  He testified that

Lippert's safety manual contained no safe work practices or procedures for Williams's job. There was no evidence that Lippert tracked the training that its workers received. The Lippert safety manual stated that Kinro should review its job safety and health analysis (JSA) yearly for each position. A JSA identifies all the potential hazards of a job and sets out the steps to minimize an employee's exposure to a hazard. Elveston testified that he saw no evidence of a JSA for the jobs that Williams performed at the Waxahachie facility. He testified that, based on his review of the relevant materials, Lippert retained the responsibility for the safety and health at the Kinro Waxahachie facility. He reviewed the root cause analysis in the OSHA report submitted by Seward and described it as "shallow" and "not serious."

### 9. Mariano Salazar

Salazar was an assistant production manager and Williams's supervisor at the Waxahachie facility in August 2015. He testified that Kinro provided safety training and his team leaders at the facility provided on-the-job training to Williams. He testified that Kinro controlled the day-to-day details of Williams's job. He believed that the L-carts at the Waxahachie facility—like the one Williams was using at the time of his accident—should have been equipped with brakes. He testified that the L-carts that were used in Lippert's Indiana facility had brakes. Without the brakes, the L-carts were dangerous. He testified that if he sees a worker without a Kevlar

20

sleeve on the production floor, he tells the worker's line leader. He testified that Monreal was the on-site safety manager at the Waxahachie facility in 2015.

### 10. Clark Mitchell

Mitchell was Kinro's general manager. He testified that when Kinro's facility in Georgia closed, its assembly line, including carts, was transferred to Kinro's Waxahachie facility. He characterized it as a transfer of assets through the books from Kinro's Georgia facility to its Texas facility.

### 11. Shawn Lewis

Lewis is Lippert's Vice President and General Counsel. He testified that Kinro built the L-cart for the company's internal use only. When Kinro's Georgia facility closed, Kinro transferred its equipment, including the carts, to its Texas and Alabama facilities.

## D. Directed Verdict

At the conclusion of testimony, Lippert moved for a directed verdict on two grounds: (1) it owed no duty to Williams and therefore he could not prevail on his negligent undertaking claim, and (2) Lippert was entitled to the exclusive remedy defense under Texas Labor Code section 408.001 which barred Williams's claim. The trial court denied Lippert's motion.

**E.     Charge Conference**

Lippert objected to the jury charge and amended its proposed charge to include a question asking whether Kinro was a responsible third party on both the liability and proportionate responsibility questions.  After the charge conference, Lippert's counsel re-urged his verbal responsible third-party motion that he "previously made off record" and asked the trial court, "is that motion denied?"  The trial court responded, "[i]t's denied primarily because of the Rule 11 Agreement."

**F.     Jury Findings and Verdict**[11]

Question 1 of the trial court's jury charge asked the following:

"Did the negligence, if any, of those named below proximately cause the injury in question?"

The charge defined negligence generally and instructed:

The term "negligence" when used with respect to the conduct of Lippert Components, Inc. (Lippert) has a specific meaning.  Lippert was negligent only if: (i) Lippert exercised specific control over the specific aspect of safety that is alleged to have caused Quinton Williams'[s] injury; (ii) Lippert failed to exercise reasonable care in exercising that specific control; and (iii) either Quinton Williams relied on Lippert's exercise of specific control, or Lippert increased Quinton Williams'[s] risk of harm in exercising such specific control.

It further instructed:

---

[11]     A jury submission for a negligence claim predicated on a negligent undertaking theory requires a broad-form negligence question accompanied by instructions detailing the essential elements of an undertaking claim. *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838–39 (Tex. 2000)).

22

You are instructed that a parent company does not have a general duty to provide a safe workplace. A parent company is not liable for the obligations of its subsidiary unless it actually controls the specific aspect of safety that is alleged to have caused the Plaintiff's injury.

You are further instructed that under the law, a parent company does not undertake to perform a safety-related service of its subsidiary based solely on its right to control general operations of the workplace.

**Quinton Williams**　　　　　_____

**Lippert Component, Inc.**　　　_____

The jury found both Lippert and Williams negligent, and it apportioned 95% responsibility to Lippert and 5% responsibility to Williams. The jury found Williams's total damages to be $1,699,684.41 in the following amounts:

a. Physical pain and mental anguish sustained in the past.

   Answer: 87,600.00

b. Physical pain and mental anguish that, in reasonable probability, Williams will sustain in the future.

   Answer: 613,200.00

c. Physical impairment sustained in the past.

   Answer: 87,600.00

d. Physical impairment that, in reasonable probability, Williams will sustain in the future.

   Answer: 613,200.00

e. Medical care expenses that, in reasonable probability, Williams will incur in the future.

Answer: <u>198,084.41</u>

The trial court signed the final judgment based on the jury's verdict, taking into account Williams's 5% contributory negligence. The judgment stated, in relevant part:

> At the time of trial, [Williams's] live pleadings asserted a claim for negligent undertaking against [Lippert Components] . . . . The verdict of the jury found [Lippert Components] 95% at-fault for negligent undertaking and found [Williams] 5% at-fault for negligence.

Based on the jury's findings, the judgment awarded the following amounts to Williams, totaling $1,519,700.19:

- $83,220.00 for physical pain and mental anguish sustained in the past;

- $582,540.00 for physical pain and mental anguish that, in reasonably probability, Williams will sustain in the future;

- $83,220.00.00 for physical impairment sustained in the past;

- $582,540.00 for physical impairment that, in reasonable probability, Quinton Williams will sustain in the future; and

- $188,180.19 for medical care expenses that, in reasonably probability, Quinton Williams will incur in the future.

The judgment further awarded Williams pre- and post-judgment interest and court costs.

Lippert moved for a new trial, which the court denied on May 23, 2022. This appeal followed.

## Submission of Negligent Undertaking Claim

In its first issue, Lippert contends that the trial court erred in submitting general negligence and negligent undertaking claims to the jury because, as Kinro's parent company, Lippert did not owe or undertake a duty to ensure the safety of its subsidiary's employees. It further argues that the evidence presented at trial was legally and factually insufficient to support the jury's determination that Lippert exercised specific control over the specific aspects of safety of Kinro's Waxahachie facility that caused Williams's injury. In response, Williams contends that the record is replete with evidence of Lippert's role overseeing safety at Kinro. He asserts that Lippert owed him a duty because it undertook extensive responsibility for safety at Kinro, he and Kinro relied on Lippert's undertaking, and Lippert made the danger worse.

### A. Standard of Review

In conducting a legal sufficiency review, we view the evidence in the light most favorable to the verdict, disregarding all evidence and inferences to the contrary. *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003); *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). We may sustain a legal sufficiency, or no-evidence, point if the record reveals one of the following: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the

evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence established conclusively the opposite of the vital fact. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). If more than a scintilla of evidence exists, it is legally sufficient. *Lee Lewis Constr.*, 70 S.W.3d at 782. More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Id*. at 782–83.

In reviewing the factual sufficiency of the evidence, we consider all of the evidence in the record in a neutral light and set aside the fact findings only if they are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When an appellant challenges an adverse finding on an issue on which it did not have the burden of proof at trial, we set aside the verdict only if the evidence supporting the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain*, 709 S.W.3d at 176; *see also Four J's Cmty. Living Ctr., Inc. v. Wagner*, 630 S.W.3d 502, 516 (Tex. App.—Houston [1st Dist.] 2021, pet denied).

**B.    Duty Element**

A negligence cause of action has three elements: (1) a legal duty, (2) breach of that duty, and (3) damages proximately resulting from the breach. *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022); *Watanabe v. Summit Path*

*Partners, LLC*, 650 S.W.3d 112, 125 (Tex. App.—Houston [1st Dist.] 2021, no pet.). The existence of a legal duty by the defendant to the plaintiff is an essential element of a plaintiff's negligence claims. *See United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 638 (Tex. 2023). If the defendant has no duty, then it cannot be held liable for negligence. *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). The threshold inquiry in a negligence case is whether a duty exists, which "is a question of law for the court to decide from the facts surrounding the occurrence in question." *Elephant Ins. Co.*, 644 S.W.3d at 145 (internal quotations omitted). We review de novo a determination regarding whether a legal duty is owed. *See Black + Vernooy Architects v. Smith*, 346 S.W.3d 877, 882–83 (Tex. App.—Austin 2011, pet. denied).

Generally, Texas law imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances.[12] *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000); *Phillips*, 801 S.W.2d at 525; *Garcia v. Kellogg Brown & Root Servs., Inc.*, No. 01-19-00319-CV, 2020 WL 3820426, at *6

---

[12] A special relationship exists between an employer and an employee, *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990), and an employer has a duty to use ordinary care in providing a safe workplace, *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). *See also Union Pac. R.R. Co. v. Nami*, 498 S.W.3d 890, 896 (Tex. 2016) (noting, absent certain exceptions, that "an employer's duty to provide a safe workplace . . . always exists" (alteration in original) (internal quotations omitted) (quoting *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 201 (Tex. 2015)).

(Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.). However, one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured by the undertaking. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119–20 (Tex. 1976). A voluntary undertaking gives rise to liability for physical harm if the actor fails to exercise reasonable care in performing the undertaking. *See Elephant Ins. Co.*, 644 S.W.3d at 151.

To establish a "negligent undertaking," a plaintiff must show that (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm. *Nall*, 404 S.W.3d at 555–56 (citing RESTATEMENT (SECOND) OF TORTS § 324A (providing rule for liability to third person for negligent performance of undertaking)). The critical inquiry concerning the duty element of a negligent undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist. *See Elephant Ins. Co.*, 46 S.W.3d at 151; *see also Osuna v. S. Pac. R.R.*, 641 S.W.2d 229, 230 (Tex. 1982).

The Texas Supreme Court has held that in cases where a plaintiff alleges negligence in maintaining a safe workplace, the plaintiff must show that the party it asserts had a duty to provide a safe workplace had actual control or a right of control over the specific aspect of the safety and security of the premises that led to the plaintiff's injury. *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993); *Brooks v. Nat'l Convenience Stores, Inc.*, 897 S.W.2d 898, 902–03 (Tex. App.—San Antonio 1995, no writ). Parent corporations generally have no duty to control their subsidiaries. *See R&M Mixed Beverage Consultants, Inc. v. Safe Harbor Benefits, Inc.*, 578 S.W.3d 218, 230 (Tex. App.—El Paso 2019, no pet.) (citing *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984)). Only corporations that have the right to control or actually control safety and security policies of the workplace have a duty to the workers to maintain a safe workplace. *See Tidwell*, 867 S.W.2d at 23 ("We consider . . . the nature of the matters to which the right of control extends to be determinative. We think that in a case alleging negligence in maintaining a safe workplace, the court's inquiry must focus on who had specific control over the safety and security of the premises . . . ."); *Morris v. Scotsman Indus., Inc.*, 106 S.W.3d 751, 754 (Tex. App.—Fort Worth 2003, no pet.). A court cannot infer a duty from evidence showing actual control or a right of control over the general operation of the workplace. *Tidwell*, 867 S.W.2d at 23; *Morris*, 106 S.W.3d at 754.

Here, Question 1 of the trial court's charge instructed the jury that "Lippert was negligent only if . . . Lippert exercised specific control over the specific aspect of safety that is alleged to have caused . . . Quinton Williams'[s] injury." Thus, to impose a duty on Lippert, Williams had to put on evidence that Lippert exercised specific control over the specific aspects of safety at Kinro's Waxahachie facility that caused Williams's injuries.

Williams argues that Lippert owed him a duty because it undertook extensive responsibility for safety at Kinro. In support of his assertion, he points to Seward's testimony that Lippert "undert[ook] responsibility making sure that each of [its] divisions operates safely," its "goal" was to institute safety at its various subsidiaries, and Seward was in charge of ensuring that Lippert's safety policies and procedures were in place at its facilities. Evidence of a parent company's general commitment to workplace safety, however, does not demonstrate actual control or the right to control the specific aspect of safety required to impose a duty. *See Tidwell*, 867 S.W.2d at 23; *Morris*, 106 S.W.3d at 755 (concluding testimony of subsidiary's manager—that subsidiary's president reported to parent company's Chief Executive Officer and parent company had right to terminate subsidiary's president and its safety coordinator if his performance was inadequate—was evidence of parent corporation's general right of control over subsidiary's operations but did not meet *Exxon* standard requiring plaintiff to show that parent company had specific control

over safety and security of premises, in particular forklift licensing and safety program); *see also Mack v. RPC, Inc.*, 439 F. Supp. 3d 897, 902 (E.D. Tex. 2020) (order) (applying Texas law and holding company's issuance of safety policy stating parent was "committed to providing a safe and healthy workplace" did not constitute specific undertaking to ensure that employees at facility were protected from accidents involving pipes).

Williams also focuses on Seward's testimony that Lippert conducted quarterly safety audits of its subsidiaries, it inspected the Waxahachie facility for hazardous conditions and put plans in place to correct the hazards it observed, and it was aware of the safety issues at Kinro. However, the evidence also shows that while Lippert conducted safety audits at Kinro and its other subsidiaries, Seward testified that he could only make recommendations to Kinro and could not force Kinro management to follow the recommendations. He testified that Kinro, not Lippert, made the decisions about whether to replace or repair a piece of equipment, the L-carts at the Waxahachie facility were purchased by Kinro and maintained by Kinro employees, and Lippert could not force Kinro to modify the carts, including equipping the carts with brakes. Seward also testified that Lippert could not force Kinro to use a particular method of stacking glass and that Kinro, not Lippert, decided the level of cut resistance of the Kevlar sleeves its workers used and Lippert could not require them to purchase a certain cut level. *See Cleveland Reg. Med. Ctr., L.P. v. Celtic*

31

*Props., L.C.*, 323 S.W.3d 322, 351 (Tex. App.—Beaumont 2010, pet. denied) (concluding tenant's parent company did not owe duty to landlord and was therefore not liable under negligent undertaking theory for tenant's alleged failure to maintain premises where parent company was not involved in tenant's day-to-day operations, tenant was responsible for maintenance and repairs of property, and landlord presented no evidence showing parent company undertook to perform for landlord with respect to the maintenance or repair of property); *see also White v. Elcor Corp.*, No. 09-99-00381-CV, 2001 WL 359833, at *1–2 (Tex. App.—Beaumont Apr. 12, 2001, no pet.) (not designated for publication) (holding parent company had not undertaken duty to provide safety for subsidiary's employees; evidence showed that although parent company's vice president of administration advised and consulted with some subsidiaries regarding employee health and safety and was authorized to discuss safety problems with subsidiary's management, he had no direct responsibility or control over subsidiary's safety procedures, he did not have authority to approve responses to safety problems, and responsibility remained with subsidiary's management).

Williams argues that Lippert undertook the responsibility for ensuring workplace safety at the Waxahachie facility because Lippert issued a safety manual setting forth its safety policies, and it wanted its policies and procedures communicated to the workers at the facility and followed. Seward testified,

32

however, that it was Kinro's responsibility to provide the safety and human resource manuals to Kinro employees, not Lippert's, and that someone at Kinro should have reviewed the thirteen topics in the safety manual with workers and obtained their signatures acknowledging receipt of the manual. As the Texas Supreme Court has noted, "mere promulgation of safety policies does not establish actual control." *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 611 (Tex. 2002); *see Ross Stores, Inc. v. Miller*, 612 S.W.3d 682, 691 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (noting evidence that parent company had employment handbook reflecting its "zero tolerance policy" for workplace violence, and that parent company set up hotline discussed in handbook and urged employees to report incidents by calling hotline or notifying manager of incident, demonstrated nothing more than promulgation of safety policies and no evidence existed that retail store was obligated to follow policies); *Cleveland Reg. Med. Ctr.*, 323 S.W.3d at 351 (finding parent company owed no duty for its subsidiary's negligence despite existence of policy manual, issued by parent corporation and applicable to its subsidiary, stating that parent company was "committed to providing a safe and healthy workplace for all colleagues"); *see also Mack*, 439 F. Supp.3d at 902 (concluding parent company's issuance of safety policy expressing general commitment to provide safe and healthy workplace did not constitute specific undertaking to ensure that subsidiary's employees were protected from specific type of accident that injured employee);

*Entex, A Div. of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1, 10 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) ("[I]nternal procedures do not create a negligence duty where none would otherwise exist.").

Williams asserts that the evidence showing that Lippert never confirmed that workers at the Waxahachie facility received the safety manual, did not match any of the signed acknowledgments with new workers, did not recommend that brakes be installed on the L-cart, and never ensured that Williams received any safety training in how to safely handle glass supports imposing a duty on Lippert under a negligent undertaking theory. This argument is unavailing. A negligent undertaking claim requires an affirmative action and cannot be predicated on a failure to act. *See Elephant Ins.*, 644 S.W.3d at 152 (noting failure to give safety warning is omission and not undertaking); *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 396–97 (Tex. 1991) (holding negligent undertaking claim failed because defendant did not undertake "an affirmative course of action"); *Colonial Sav. Ass'n*, 544 S.W.2d at 119 (stating undertaking requires "an affirmative course of action"); *Knife River Corp.–S. v. Hinojosa*, 438 S.W.3d 625, 631–32 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (noting one who voluntarily undertakes affirmative course of action for benefit of another has duty to exercise reasonable care that other's person or property will not be injured); *Thornton v. Henkels & McCoy, Inc.*, No. 13-12-00585-CV, 2013 WL 5676026, at *3 (Tex. App.—Corpus Christi–Edinburg Oct.

34

17, 2013, no pet.) (mem. op.) (holding defendant, who failed to repair sagging cable line, was not liable for negligent undertaking because claim requires "affirmative course of action" and cannot be predicated upon alleged negligent omission or failure to act).

In support of his argument that Lippert owed him a duty to provide safety, Williams cites *Little v. Delta Steel, Inc.*, 409 S.W.3d 704 (Tex. App.—Fort Worth 2013, no pet.), *Johnson v. Abbe Engineering Co.*, 749 F.2d 1131 (5th Cir. 1984), and *Shelby v. Granbury Care Center*, No. 10-05-00063-CV, 2006 WL 1041993 (Tex. App.—Waco Apr. 12, 2006, pet. denied) (mem. op.).

In *Little*, an employee of Delta Steel died while using an electromagnetic crane to move a steel plate when the plate dislodged from the magnet and fell, crushing him. *See* 409 S.W.3d at 706. Little's widow, children, and executrix of his estate sued Delta Steel and its parent company, Reliance Steel and Aluminum Company, alleging that Reliance had undertaken a responsibility to ensure safety for Delta Steel's employees and had been negligent and grossly negligent in failing to perform that responsibility, causing Little's fatal crane accident. *See id.* at 707. Reliance then moved for summary judgment arguing that it could not be liable in negligence because, as Delta Steel's parent company, it did not have control over Delta Steel's day-to-day operations and did not owe Little a duty of care. *Id.* The

35

trial court granted summary judgment in favor of Reliance on the negligent undertaking claim. *See id.*

The Fort Worth Court of Appeals held that the evidence established that Reliance voluntarily undertook a duty owed by Delta Steel to provide safety to Little. *See id.* at 721. It concluded that the duty arose because Reliance not only generally controlled aspects of Delta Steel's safety policies through, among other acts, commanding the inclusion of certain provisions in Delta Steel's manual, but it also (1) specifically controlled policies concerning the inspection of cranes, such as requiring Delta Steel to hire an independent inspection company, (2) had the authority to audit Delta Steel's Fort Worth plant and to require Delta Steel to correct safety issues discovered upon an audit, (3) audited Delta Steel's other plants, (4) had the authority to require Delta Steel to take a malfunctioning crane out of service, and (5) required Delta Steel to mail monthly reports on accidents and investigations to Reliance. *See id.* Thus, the evidence showed that Reliance had the controlling, primary authority for maintaining safety at Delta Steel's facilities. *See id.*

*Little* is distinguishable from the facts in this case in several key respects. First, there is no evidence that Lippert specifically controlled policies concerning the inspection and maintenance of L-carts. There is also no evidence that Lippert could require Kinro to take any action with respect to the L-carts, which included correcting safety issues. Rather, Seward testified that he could only make

36

recommendations to Kinro and could not force Kinro management or employees to follow the recommendations. He testified that it was Kinro, not Lippert, who made the decisions about whether to replace, repair, or modify a piece of equipment, including the L-carts, and Lippert could not require Kinro employees to use a particular method of stacking glass. There was also no evidence that Lippert instituted mandatory reporting requirements on Kinro.

In *Johnson*, an explosion occurred severely injuring several employees of a wholly owned subsidiary. *See* 749 F.2d at 1132. The plaintiffs sued the parent corporation on a negligent undertaking theory. *See id.* The jury found in favor of the plaintiffs, and the parent company appealed asserting that the evidence did not support the jury's findings that it owed the plaintiffs a duty. *See id.*

At trial, the parent company's manager of accident prevention and safety training testified that he had inspected the area where the accident occurred several times during the years preceding the accident during the course of a safety "audit of the entire complex." *Id.* at 1133. He further testified that he knew of the prescribed ball mill procedures and was aware that explosive and highly flammable solvents were being used. *Id.* The safety manager testified that his duties included review and approval of the broad spectrum of safety practices and procedures at the parent company's subsidiaries, he expected his safety directives and suggestions to be followed and implemented, and that expectation was met. *Id.* Additionally, the

subsidiary's plant manager testified that he relied upon the parent company's safety representatives for accident prevention and safety training and followed any recommendations made concerning safety at the facility. *Id.* at 1133–34. The subsidiary's production foreman testified that personnel relied upon the expertise of the parent company's safety division in matters relating to safety. *Id.* at 1134.

The Fifth Circuit Court of Appeals affirmed the trial court's judgment, concluding that the evidence was sufficient to support the jury's finding that the parent company had undertaken a duty to protect its subsidiary's employees because it had undertaken to inspect the entire plant of which the instrument causing the injuries was a part. *See id.* at 1133. It concluded that, from the evidence presented at trial, the jury could reasonably have found that the subsidiary was "lull[ed] into a false sense of security." *Id.* at 1134.

Here, the record contains no evidence that Lippert's involvement at the Waxahachie facility was related to the specific aspect of safety that caused Williams's injury. While Seward testified that Lippert wanted Kinro to communicate its policies and procedures to its workers and for the Waxahachie facility to comply with them, he also testified that Lippert could not mandate that Kinro follow them. Kinro management decides how to implement the guidelines and whether to make the safety manual available to workers, and Lippert neither provided the safety manual to Kinro employees nor confirmed that Kinro did so.

38

Seward testified that a failure to give the safety manual to workers or provide job training to them would be a failure on Kinro's part, not Lippert's. As to Monreal's testimony that "Lippert had safety corporate people that were EHS, Environmental, Health and Safety that would visit" the Waxahachie facility and "different safety coordinators from Lippert contact[ed] him for different occasions," these statements do not demonstrate that Lippert had "actual control or a right of control over the *specific* aspect of safety and security . . . that led to [Williams's] injury." *Morris*, 106 S.W.3d at 754 (citing *Tidwell*, 867 S.W.2d at 23).

In *Shelby*, a nurse, Shelby, was assigned by her employer, Vitas, a healthcare company, to provide nursing services to the hospice patients of Granbury Care Center. *See* 2006 WL 1041993, at *1. Shelby was injured after a Granbury employee refused to help her transfer a patient who weighed over three hundred pounds from his bed to his wheelchair. *See id.* Shelby sued Granbury claiming it was negligent in failing to assist her in transferring the patient and in failing to provide adequate employees to take care of the center's patients. *See id.* Granbury moved for summary judgment on Shelby's negligent claim, asserting that it did not owe a duty to Shelby. *See id.* The trial court granted the motion. *See id.*

The Waco Court of Appeals reversed the summary judgment, holding that a fact issue existed as to whether Granbury undertook to assist Vitas employees in such a manner as to create a duty to Shelby. *See id.* at *4. In particular, the court

39

noted that there was uncontroverted evidence that, prior to the incident in which Shelby was injured, Granbury employees always assisted Shelby in transferring patients from their beds to their wheelchairs. *See id.* There was also evidence that it was commonly understood by Granbury employees that they must assist Vitas employees in transferring patients out of bed. *See id.* The court stated that even if Granbury ordinarily would not have had a duty to assist Vitas employees in transferring patients, it arguably assumed such a duty by consistently assisting Vitas employees in the past. *See id.*

Here, unlike in *Shelby*, there is no history of Lippert controlling, inspecting, or maintaining the specific aspect of safety that led to Williams's injury. *See Tidwell*, 867 S.W.2d at 23; *Morris*, 106 S.W.3d at 754. There is also no evidence that Lippert controlled or had the right to control employee training. Instead, the record shows that control over the L-cart, including any repairs, replacement, or modification, such as equipping it with brakes, as well as employee training on, among other things, how to properly handle glass, rested solely with Kinro. *See Ross Stores*, 612 S.W.3d at 691 (holding absent evidence showing direct participation by parent company in circumstances precipitating employee's injuries, there was no basis for concluding parent was required to protect employee from injuries that occurred at subsidiary's store) (citing *Abdel-Fattah v. Pepsico, Inc.*, 948 S.W.2d 381, 385–86 (Tex. App.—Houston [14th Dist.] 1997, no writ)).

40

We conclude that there is no more than a scintilla of evidence that Lippert exercised control with respect to the specific aspect of safety that led to Williams's injury necessary to impose a duty on Lippert. *See Lee Lewis Constr.*, 70 S.W.3d at 782. Because the jury's negligence finding is not supported by legally sufficient evidence, we sustain Lippert's first issue.[13]

## Conclusion

We reverse the judgment of the trial court and render judgment that Williams take nothing by way of his claims against Lippert.

Kristin Guiney
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

---

[13] In light of our disposition, we do not reach Lippert's remaining issues contending that Williams's pleadings did not put Lippert on notice of a general negligence or negligent undertaking claim, Williams's claims are barred by the exclusive remedy doctrine, the evidence was legally and factually insufficient to support the jury's award of future medical expenses, the trial court erred in denying Lippert's motion to designate Kinro as a responsible third party and refusing to submit Kinro's proportionate responsibility to the jury, and the trial court erred when it refused to submit jury questions and instructions on the application of the exclusive remedy defense and whether Lippert exercised control over specific safety aspects that led to Williams's injury. *See* TEX. R. APP. P. 47.1.